No. 95-053

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

THE ESTATE OF ROBERT J. STREVER,
and JOLLEEN STREVER, Individually,
and as Personal Representative of
said Estate,

Plaintiffs and Appellants,

v.

STEVEN CLINE, a minor; THOMAS
MORRIS, a minor; BOWEN RACINE,
a minor; and TOM E. SUSANJ,·

Defendants and Respondents.

FILED

JUN 27 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Robert W. Holmstrom, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Craig W. Holt, Billings, Montana

For Respondent:

Michael B. Anderson (argued) & V. Ann Liechty,
Gannett, Anderson & Liechty, Billings, Montana

Heard: December 12, 1995
Submitted: January 30, 1996

Decided: June 27, 1996

Filed:

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

Eleven-year-old Robert Strever died May 3, 1992, as a result of a single gunshot wound to the head. Robert was shot with a handgun that he and several companions had stolen from a vehicle. Robert's mother brought an action against the owner of the vehicle and the three boys present at the time of the shooting. The District Court for the Thirteenth Judicial District, Yellowstone County, granted summary judgment in favor of the vehicle owner and one of the boys and entered default against the remaining two boys. The District Court subsequently granted Plaintiffs' Motion for Rule 54(b) Certification to this Court. We affirm.

The issues presented for review are:

1. Whether the District Court erred in determining that Thomas Susanj did not owe a legal duty to Robert Strever.

2. Whether the District Court erred in determining that, even if Thomas Susanj owed a legal duty to Robert Strever, the breach of that duty was not a proximate cause of Robert's death.

Background Facts

On Friday, May 1, 1992, Robert contacted his mother at work and requested permission to go on a weekend fishing trip with his friend, Brent McKellip. Robert's mother instructed him to contact his grandmother, Josephine Strever, and have her speak with Brent's father to get the details of the trip. Josephine called the McKellip home and spoke with an individual who represented himself as Mr. McKellip. He stated that the boys would be leaving for the fishing trip on Friday evening and that they would return to

2

Billings on either Saturday or Sunday.

When the boys came to collect Robert's clothing for the weekend trip, Josephine expressed her suspicions of Mr. McKellip's youthful sounding voice. Robert and Brent told her that it was due to Mr. McKellip having a sore throat. After Robert's death, it came to light that the fishing trip was a ruse and that fourteen-year-old Steven Cline pretended to be Mr. McKellip to obtain permission for Robert to spend the weekend with Brent.

On Saturday evening, May 2nd, Robert, Cline and another boy, Bowen Racine, attended a movie. After leaving the movie theater, the boys decided to enter several parked vehicles in the neighborhood and steal their contents.

Tom Susanj was in Billings that weekend to visit his father who had been transferred to St. Vincent's Hospital for medical care. Susanj had parked his pickup on the street in front of a relative's home and had left it for the night. Located in the cab of his pickup were a Spectrum radar detector, keys, a micro cassette recorder, jumper cables, a Black & Decker car light, Bushnell binoculars, a Shakespeare fishing rod and case, a tape case with 30 cassette tapes, a small tool box, and a Fujica camera. Underneath the seat of the pickup, in a white bag, was a Ruger 22-caliber semiautomatic pistol and ammunition.

In the early morning hours of May 3rd, the three boys entered Susanj's pickup and removed several items. Although Susanj testified that it was his normal practice to lock his pickup, there was no evidence of forced entry. Susanj was not aware, nor had he

3

reason to be aware, of a crime problem, if any, in that neighborhood.

Sixteen-year-old Thomas Morris joined Robert, Cline and Racine after noticing them near Susanj's pickup. All four boys then returned to the pickup to search for more items to steal. Morris took the white bag from under the driver's seat and discovered that it contained the handgun and ammunition. An animated discussion ensued over who should have the gun. After removing the gun from the bag, Morris either handed the gun to Cline at Cline's request or Cline took the gun from Morris. Either way, Cline gained control of the gun. Prior to the incident Cline had been smoking marijuana and had informed Morris he was "high".

Morris testified that Cline waved the gun around while his finger continually rested on the trigger. In the process of examining the gun, Cline ejected a live shell from the chamber. Cline was attempting to remove the ammunition clip from the gun when the gun discharged, the bullet striking Robert in the head. Susanj later testified that he did not keep the clip in the gun. However, Morris and Cline testified that the clip was in the gun when they took it from the bag.

After Robert fell to the ground, the other boys panicked. Morris and Racine ran down an alley and Cline followed, still carrying the gun. Morris and Racine urged Cline to put the gun down and he complied. Cline went to a nearby convenience store and called the police. The police later retrieved the gun from the spot where Cline placed it. Cline was convicted of negligent

homicide for the death of Robert Strever.

Plaintiffs brought a civil action against the vehicle owner, Susanj, claiming that his negligent act of leaving his vehicle unattended and unlocked in a public thoroughfare contributed to the wrongful death of Robert Strever. Plaintiffs claimed that Robert's three companions, Morris, Cline and Racine, should also be held liable for Robert's death because they were involved in stealing the handgun from Susanj's pickup. Plaintiffs claimed that Morris, as the oldest of the boys and the one with some familiarity of handguns, was negligent in failing to prevent harm to Robert and in failing to warn Robert of the danger involved with a loaded gun.

The District Court granted summary judgment in favor of Susanj and Morris on the grounds that neither of them owed a duty to Robert. The District Court further held that even if Susanj and Morris owed a duty to Robert, their actions or inactions were not the proximate cause of Robert's death. The District Court entered default against the remaining two defendants, Cline and Racine, for failure to appear.

Upon motion by Plaintiffs and without objection by Morris and Susanj, the District Court granted Plaintiff's Motion for Rule 54(b), M.R.Civ.P., Certification to this Court. Morris was subsequently dismissed from the appeal.

## Standard of Review

Our standard of review in appeals from summary judgment rulings is *de novo*. Mead v. M.S.B., Inc. (1994), 264 Mont. 465, 470, 872 P.2d 782, 785. When we review a district court's grant of

5

summary judgment, we apply the same evaluation as the district court based on Rule 56, M.R.Civ.P. Bruner v. Yellowstone County (1995), 272 Mont. 261, 264, 900 P.2d 901, 903. In Bruner, we said:

> The movant must demonstrate that no genuine issues of material fact exist. [Citation omitted.] Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. [Citation omitted.] Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law. [Citation omitted.] We review the legal determinations made by a district court as to whether the court erred. [Citation omitted.]

Bruner, 900 P.2d at 903.

## Discussion

In order to sustain a negligence action, the plaintiff must establish a legal duty, breach of that duty, and damages proximately caused by that breach. Whitfield v. Therriault Corp. (1987), 229 Mont. 195, 197, 745 P.2d 1126, 1127.

> Ordinarily, issues of negligence are issues of fact not susceptible to summary adjudication. Brohman v. State (1988), 230 Mont. 198, 201, 749 P.2d 67, 69. However, actionable negligence arises only from the breach of a legal duty; the existence of a legal duty is a question of law to be determined by the district court. Nautilus Insurance Co. v. First National Insurance (1992), 254 Mont. 296, 837 P.2d 409, 411, 49 St.Rep. 802, 803.

Yager v. Deane (1993), 258 Mont. 453, 456, 853 P.2d 1214, 1216.

## Issue 1

Whether the District Court erred in determining that Thomas Susanj did not owe a legal duty to Robert Strever.

The District Court determined that Susanj did not owe a legal duty to Robert because Susanj was unaware of previous thefts in

. 6

that area of Billings that would compel him to lock his vehicle, because Susanj did not permit the boys to enter his vehicle, because Susanj did not have an open display of his firearm to lure the boys into entering his vehicle and stealing the firearm, and because Robert was not an innocent party but, rather, was a participant in the burglary.

Plaintiffs contend that Susanj had a legal duty to the general public to lock his vehicle to prevent the gun from falling into "improper hands." Susanj argues that vehicle owners have no duty to protect burglars from injuries they inflict upon themselves in the course of their criminal acts. We conclude that Susanj did owe a duty to not only Robert but also to the public in general to store his firearm and ammunition in a safe and prudent manner.

Negligence denotes "a want of the attention to the nature or probable consequences of the act or omission that a prudent man would ordinarily give in acting in his own concerns." Section 1-1-204(4), MCA. Moreover, every person is bound, without contract, to abstain from injuring the person or property of another or infringing upon any of his rights. Section 28-1-201, MCA.

At common law, a property owner's potential liability for injuries suffered by one who entered onto his land was determined by the injured party's status as an invitee, licensee or trespasser.

> A trespasser is one who enters the property of another without any right, lawful authority, or express or implied invitation, permission, or license, not in the performance of any duties to the owner, but merely for his own purposes, pleasure or convenience.

7

Williams v. Bill's Custom Fit, Inc. (Tex. Ct. App. 1991), 821 S.W.2d 432, 433. Although most cases have involved trespassers on land, these same rules have been applied to trespassers on personal property. Williams, 821 S.W.2d at 433 (citing Prosser and Keeton, *The Law of Torts* § 58 (5th ed. 1984)).

A trespasser could recover under the common law "only for intentional, wanton, or willful injury or the maintenance of a hidden engine of destruction." Alston v. Baltimore & Ohio Railroad Co. (D.D.C. 1977), 433 F.Supp. 553, 560. In those states still adhering to the common-law classifications of licensee, invitee and trespasser, the general rule is that while a landowner cannot intentionally injure or lay traps for a trespasser upon his land, he owes no other duty to a trespasser. McKinsey v. Wade (Ga. Ct. App. 1975), 220 S.E.2d 30, 32 (where a storekeeper set a trap with dynamite in a vending machine and a sixteen-year-old boy was killed in the act of stealing from the machine).

While many jurisdictions still adhere to this concept, many, including Montana, have abandoned the common-law classifications of invitee, licensee and trespasser and have adopted a uniform standard of reasonable care under the circumstances. Yalowizer v. Husky Oil Co. (Wyo. 1981), 629 P.2d 465, 467.

In Limberhand v. Big Ditch Co. (1985), 218 Mont. 132, 140, 706 P.2d 491, 496, this Court held that the test for determining the duty owed by a landowner to an injured party is "not the status of the injured party but the exercise of ordinary care in the circumstances by the landowner." In Limberhand, we cited § 27-1-

8

701, MCA, which provides:

> **Liability for negligence as well as willful acts.** Except as otherwise provided by law, everyone is responsible not only for the results of his willful acts but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person except so far as the latter has willfully or by want of ordinary care brought the injury upon himself.

Limberhand, 706 P.2d at 496. Thus, the question in the case before us becomes, did Susanj exercise ordinary care in storing his gun and ammunition clip under the seat of his unlocked pickup.

The existence of a duty of care depends upon the foreseeability of the risk and upon a weighing of policy considerations for and against the imposition of liability. Maguire v. State (1992), 254 Mont. 178, 189, 835 P.2d 755, 762. The policy considerations to be weighed in determining whether to impose a duty include: (1) the moral blame attached to the defendant's conduct; (2) the desire to prevent future harm; (3) the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach; and (4) the availability, cost and prevalence of insurance for the risk involved. Phillips v. City of Billings (1988), 233 Mont. 249, 253, 758 P.2d 772, 775.

Applying these policy· considerations in the present case, reasonable minds could attach moral blame to Susanj's act of storing his gun and ammunition in an unlocked vehicle on a public street with numerous other items of attractive personal property in plain view easily accessible to thieves or simply to curious small children. In addition, requiring a gun owner to safely store his

9

firearm (for example, in this case, by merely locking the vehicle, locking the gun in the glove compartment or removing the gun and ammunition from the vehicle) would not impose an undue burden upon the gun owner in light of the danger involved and the necessity of preventing thefts of firearms or accidental shootings. Finally, various types of liability insurance policies are readily available at a reasonable cost and cover the risks inherent in the negligent use and storage of firearms.

Moreover, in our recent opinion of Busta v. Columbus Hosp. Corp. (Mont. 1996), 916 P.2d 122, 53 St.Rep. 428, we stated that duty "is measured by the scope of the risk which negligent conduct foreseeably entails." Busta, 916 P.2d at 134 (quoting Mang v. Eliasson (1969), 153 Mont. 431, 438, 458 P.2d 777, 781).

In like manner, in Prosser and Keeton on Torts the authors state:

> The amount of care demanded by the standard of reasonable conduct must be in proportion to the apparent risk. As the danger becomes greater, the actor is required to exercise caution commensurate with it. Those who deal with instrumentalities that are known to be dangerous . . . must exercise a great amount of care because the risk is great. They may be required to take every reasonable precaution suggested by experience or prudence.

W. Page Keeton et al., Prosser and Keeton on Torts § 34, at 208 (5th ed. 1984). We cited with approval this same rule in Mang when we said:

> As a classic opinion states: "The risk reasonably to be perceived defines the duty to be obeyed." Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99, 100, 59 A.L.R. 1253. That is to say, defendant owes a duty with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous, and hence negligent

10

in the first instance.

Mang, 458 P.2d at 781.

A firearm, particularly one that is loaded or has ammunition in close proximity, is considered a dangerous instrumentality and therefore requires a higher degree of care in its use or handling. This concept is set out in the Restatement (Second) of Torts, which provides:

> **Care required.** The care required is always reasonable care. This standard never varies, but the care which it is reasonable to require of the actor varies with the danger involved in his act, and is proportionate to it. The greater the danger, the greater the care which must be exercised.
> As in all cases where the reasonable character of the actor's conduct is in question, its utility is to be weighed against the magnitude of the risk which it involves. [Citation omitted.] The amount of attention and caution required varies with the magnitude of the harm likely to be done if care is not exercised, and with the utility of the act. Therefore, if the act has little or no social value and is likely to cause any serious harm, it is reasonable to require close attention and caution. So too, if the act involves a risk of death or serious bodily harm, and particularly if it is capable of causing such results to a number of persons, the highest attention and caution are required even if the act has a very considerable utility. *Thus those who deal with firearms . . . are required to exercise the closest attention and the most careful precautions, not only in preparing for their use but in using them.* [Emphasis added.]

Restatement (Second) of Torts § 298 cmt. b (1965).

Accordingly, given the foreseeability of the risk involved in the improper and unsafe use and storage of a firearm; given the strong policy considerations favoring safe and prudent use and storage; and on the basis of the law as set forth in §§ 1-1-204, 27-1-701 and 28-1-201, MCA, our decisions in Limberhand, Maguire, Phillips, Mang and Busta and the above referred to standards of

11

care set forth in Prosser and Keeton on Torts and in comment b to § 298 of the Restatement, we hold that, as a matter of law, the owner of a firearm has a duty to the general public to use and to store the firearm in a safe and prudent manner taking into consideration the type of firearm, whether it is loaded or unloaded, whether the ammunition is in close proximity or easily attainable, and the location and circumstances of its use and storage.

Because we conclude that Susanj owed a legal duty to the general public to store his firearm and ammunition in a manner consistent with this standard of care, on the material facts here, we reverse the District Court's legal conclusion that Susanj owed no legal duty to Robert.

### Issue 2

Whether the District Court erred in determining that, even if Thomas Susanj owed a legal duty to Robert Strever, the breach of that duty was not a proximate cause of Robert's death.

Implicit in the District Court's ruling that Susanj's conduct did not cause Robert's death is the conclusion that Susanj did not breach any duty of care that he might have had to Robert. Breach of a legal duty is a question of fact that is properly determined by the fact finder. Similarly, causation requires a determination--ordinarily by the fact finder--that defendant's conduct helped produce the injury and that the injury would not have occurred without it. Proximate cause is proved by establishing cause in fact, i.e., the "but for" test or "substantial factor" test.

12

Prosser and Keeton on Torts § 41, at 263-72.

We recently determined in Busta v. Columbus Hosp. Corp. (Mont. 1996), 916 P.2d 122, 138, 53 St.Rep. 428, 441, that ordinarily foreseeability is part of the analysis of "duty," rather than "proximate cause," and that to analyze it under both issues leads only to confusion. In Busta, we overruled that part of our decision in Kitchen Krafters v. Eastside Bank (1990), 242 Mont. 155, 789 P.2d 567, that required a two-tiered analysis of causation in cases other than those where there has been an allegation that the chain of causation is severed by an independent intervening cause. Since the case before us is just such an intervening causation case, foreseeability is properly considered with respect to causation on that basis, and, under the facts here, we conclude that failure of proof of causation can be determined as a matter of law.

We have previously stated that a defendant's liability for his wrongful act will not be severed by the intervening act of a third party if the intervening act is one that the defendant might reasonably foresee as probable or one that the defendant might reasonably anticipate under the circumstances. Thayer v. Hicks (1990), 243 Mont. 138, 155, 793 P.2d 784, 795 (citing Nehring v. LaCounte (1986), 219 Mont. 462, 470, 712 P.2d 1329, 1334).

As to intervening acts by third parties in relation to a defendant's conduct, Prosser and Keeton state:

> The question is always one of whether the defendant is to be relieved of responsibility, and the defendant's liability superseded, by the subsequent event. In general, this has been determined by asking whether the

13

intervention of the later cause is a significant part of the risk involved in the defendant's conduct, or is so reasonably connected with it that the responsibility should not be terminated. It is therefore said that the defendant is to be held liable if, but only if, the intervening cause is "foreseeable."

Prosser and Keeton on Torts § 44, at 302.

In Mills v. Mather (1995), 270 Mont. 188, 890 P.2d 1277, we recognized that although most negligence actions contemplate some action on the part of a defendant which is the actual and proximate cause of the plaintiff's damages, failure to act can also form the basis for a claim of negligence.

> There are . . . situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others. In general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him against such intentional misconduct . . . .

Mills, 890 P.2d at 1283-84 (quoting Restatement (Second) of Torts § 302B cmt. e (1965)).

However, we have also stated that the criminal or intentional actions of a third person may not be foreseeable. Sizemore v. Montana Power Co. (1990), 246 Mont. 37, 47, 803 P.2d 629, 635-36 (citing Cole v. German Savings and Loan Society (8th Cir. 1903), 124 F. 113). Similarly, a grossly negligent act on the part of a plaintiff may also be considered unforeseeable. Sizemore, 803 P.2d at 636.

Along these same lines, in Prosser and Keeton on Torts the authors state:

> There is normally much less reason to anticipate acts on the part of others which are malicious and intentionally damaging than those which are merely

14

negligent; and this is all the more true where, as is usually the case, such acts are criminal. Under all ordinary and normal circumstances, in the absence of any reason to expect the contrary, the actor may reasonably proceed upon the assumption that others will obey the criminal law.

Prosser and Keeton on Torts § 33, at 201. With that in mind, a review of some of our prior cases involving intervening criminal acts by third parties is appropriate.

In 1990, the relatives of a minor killed by an ex-convict sued the State of Montana over the convict's release. VanLuchene v. State (1990), 244 Mont. 397, 797 P.2d 932. Plaintiffs claimed that the state has a duty to avoid the release of prisoners whose mental illnesses render them dangerous to society. The District Court found that plaintiffs' theories of proximate cause were too speculative and that the state's acts were not the proximate cause of plaintiffs' injuries. Although this case involved an intervening act by a third party, we did not reach that point in our analysis since we held that the state did not owe a duty to plaintiffs because once the inmates' sentence had expired, the state had no choice but to release him.

Three months later, in Kiger v. State (1990), 245 Mont. 457, 802 P.2d 1248, we were faced with a similar situation when the state was again sued over the release of a Montana State Prison inmate. In Kiger, several days after his release on parole, a former prison inmate shot a woman while attempting to steal her car. Plaintiff claimed the state was negligent in releasing the parolee. In Kiger we analyzed proximate cause in terms of foreseeability because of the intervening act and we said that in

15

this case "there are too many 'what ifs' that are superseding events that break the chain of causation." Kiger, 802 P.2d at 1251.

Two years later, in U.S. Fidelity and Guar. Co. v. Camp (1992), 253 Mont. 64, 70, 831 P.2d 586, 589, we said that not all intervening causes will act so as to absolve the defendant of liability. The plaintiff in Camp brought an action in negligence to recover moneys paid to its insured for damages resulting from a fire in an apartment building. In Camp, we said:

> The chain of causation will only be broken, thereby cutting off the defendant's liability, if the intervening cause is reasonably unforeseeable. Thayer, 793 P.2d at 795. However, if the intervening cause is one that the defendant might reasonably foresee as probable, or one that the defendant might reasonably anticipate under the circumstances, then the intervening act does not absolve the defendant of liability. Nehring v. LaCounte (1986), 219 Mont. 462, 712 P.2d 1329.

Camp, 831 P.2d at 589.

The following year in King v. State (1993), 259 Mont. 393, 856 P.2d 954, the parents of a young man murdered by a former mental patient of the Montana State Hospital brought suit against the state for negligence in releasing the patient to the community. In King, we relied on our three prior opinions in VanLuchene, Kiger and Camp and reiterated that the intervening acts must be reasonably foreseeable to establish proximate cause. We also stated in King that

> if a plaintiff's injury is caused by the intervening act of a third party, the defendant's actions *cannot* be viewed as the proximate cause of that injury. [Emphasis added.]

King, 856 P.2d at 956 (citing Graham v. Montana State University

16

(1988), 235 Mont. 284, 289-90, 767 P.2d 301, 304). Our use of the word "cannot" in this statement was an unfortunate choice as Graham does not state such a hard and fast rule and we had not intended to, nor did we, set forth such a hard and fast rule in King. In actuality, we said in Graham that:

> If there is no room for a reasonable difference of opinion as to whether the action of a party other than the defendant is the intervening cause of the plaintiff's injury, summary judgment based on proximate cause is proper.

Graham, 767 P.2d at 304. For that reason, we overrule the statement in King that we quoted above and we reiterate that our holding in King is that "the intervening acts must be reasonably foreseeable to establish proximate cause."

Our prior cases involving intervening criminal acts discussed above involved fact situations that were properly disposed of by the trial courts as a matter of law. Nevertheless, we emphasize that a cause of action involving superseding intervening acts, whether criminal or non-criminal, normally involves questions of fact which are more properly left to the finder of fact for resolution. If, under the facts of a given case, an intervening criminal act is one which the defendant might reasonably foresee, then there is no reason why the fact finder should not decide causation the same as with any other intervening causation case. Three of our earlier cases, Lencioni v. Long (1961), 139 Mont. 135, 361 P.2d 455; Brown v. First Federal Sav. & L. Ass'n of Great Falls (1969), 154 Mont. 79, 460 P.2d 97; and Schafer v. State, Dept. of Institutions (1979), 181 Mont. 102, 592 P.2d 493, stand for a

17

contrary rule--i.e. that <u>no</u> recovery can be allowed for an injury which resulted from an intervening criminal act of a third person. To that extent, we overrule those three cases and any other Montana authority espousing that rule.

Rather, trial courts must continue to carefully review each fact situation involving intervening criminal acts on a case-by-case basis, and it is only where reasonable minds could come to but one conclusion, that this issue is properly disposed of as a matter of law. See, for example, <u>Kiger</u>, 802 P.2d at 1251, where we affirmed the trial court's use of this same approach in granting summary judgment.

This is such a case. Here, not only were there two intervening criminal acts (two thefts from Susanj's vehicle), but there was also an intervening grossly negligent act (Cline, high on marijuana, waving the stolen gun around with his finger on the trigger, then trying to unload the weapon). Accordingly, on these facts, we conclude that reasonable minds could come to but one conclusion--that the series of intervening acts which included two criminal acts and one grossly negligent act was reasonably unforeseeable and, thereby, cut off all liability on the part of Susanj for Robert Strever's unfortunate death.

On the facts here, we hold that the District Court's grant of summary judgment was proper as any negligence by Susanj was superseded by the independent intervening criminal and grossly negligent acts described above.

Having, thus, analyzed and resolved the two legal issues in

18

this case by application of Montana's statutory law, by application of the well-established rules enunciated in decisions previously handed down by this Court and by application of other well-reasoned authority, it is now necessary that we respond to the special concurrence. While waving the red flag of "gun control" and raising the specter of "banning firearms" guarantees inflammatory headlines and a spate of letters to the editor, as a matter of legal analysis the special concurrence grossly and unfairly misrepresents this Court's opinion and misstates the law.

At the outset, the special concurrence states that we have held that:

> [A]s a matter of law, a property owner owes a legal duty to a thief or a burglar who enters an owner's property on a mission of thievery, steals the owner's property, and then injures himself or another with the stolen loot.

In fact, such a holding is nowhere to be found in our opinion. Rather, we have held simply that:

> [T]he owner of a firearm has a duty to the general public to use and to store the firearm in a safe and prudent manner taking into consideration the type of firearm, whether it is loaded or unloaded, whether the ammunition is in close proximity or easily attainable, and the location and circumstances of its use and storage.

While the special concurrence apparently views this as the judicial creation of some sort of new, radical public policy designed to undermine the constitutional right to bear arms and promote the imposition of liability upon the innocent victims of crime, it takes neither a crystal ball nor a Rhodes Scholar to readily discern the fallacy of that conclusion.

In the first place, Montana's public policy, already set forth

19

in our statutes and in force for decades, clearly and unequivocally imposes on each citizen the legal duty to, in all matters, act prudently, with a view to the nature and probable consequences of his conduct, and to abstain from injuring other persons or their property or infringing on their rights. Sections 1-1-204(4), MCA and 28-1-201, MCA. These statutes, enacted by our legislature, make no exception from the duty of care so imposed on the basis of the "status" of the individual injured by another person's act or failure to act in the manner prescribed by these laws. Rather, these statutes mandate that each person owes a general duty of care to every other person. Moreover, in furtherance of and consistent with that policy, our statutory law imposes liability on those who either willfully or negligently breach that duty of care--again regardless of the "status" of the person injured. Section 27-1-701, MCA.

While the special concurrence would carve out an exception from this statutorily-imposed general duty of care for criminals who are injured by another's breach of that duty, the black-letter law clearly does not make such an exception. To the contrary, rather than upholding the public policy set by the legislature as evidenced in the referred-to statutes, the special concurrence would simply ignore that policy in favor of one which rewards or punishes negligent conduct on the basis of the status of the person injured. Unfortunately, in so doing, the special concurrence also ignores the obligation of the courts to uphold and to fairly apply, as written, all constitutional laws. We have not rewritten public

20

policy in this opinion; we have, to the contrary, properly upheld and applied the policy which the public, through its elected representatives, has enacted.

That was precisely what we did in Limberhand, a unanimous opinion of this Court, and that is all that we have done in this case. While the special concurrence attempts to narrow Limberhand to only encompass "civil guests, invitees or trespassers" as opposed to "criminals, thieves or burglars," such an interpretation makes no sense given that trespassing, by definition, is a criminal, as well as tortious, act. See, Title 45, Chapter 6, MCA. Neither our statutes nor our controlling case law qualify a property owner's general duty of care by the "status" of the victim of the property owner's negligence. It, likewise, would be wholly improper that we do so in this case.

Secondly, the special concurrence maintains that the holding we have articulated in this case will come as a great shock to the public in general and to gun owners in particular. To the contrary, we suspect that the public and gun owners would be more surprised to learn that owning a gun does not include a responsibility and a duty to store and use the weapon in a safe and prudent manner. In point of fact, organizations which teach safety and promote responsible firearms use and ownership uniformly stress the necessity to unload and store all guns in a secure location, inaccessible to children and unauthorized persons and separate from

21

the ammunition.[1]  Our holding in this case says nothing different. If the owner of a firearm does *not* owe "a duty to the general public to use and to store the firearm in a safe and prudent manner taking into consideration the type of firearm, whether it is loaded or unloaded, whether the ammunition is in close proximity or easily attainable, and the location and circumstances of its use and storage," then that truly *is* a shocking revelation!

Moreover, the special concurrence strongly implies that under our decision here, the owner of a firearm is automatically or strictly liable for any firearms-related injury merely because of his ownership of the weapon.  That absolutely is not the case; nothing could be further from the truth.  Our holding simply sets forth the duty of care required in the use and storage of a firearm.  *If* a member of the public is injured in a firearms-related accident, as in any negligence case, it is for the fact finder--typically a jury composed of Montana citizens, some of whom would likely be gun owners--to determine whether the owner of the firearm breached his duty of care.  While the special concurrence apparently has little faith that such a jury could apply the law and come to a correct result on the basis of the particular facts at issue, we do not share that sentiment.

More to the point, the owner of a firearm who willfully or negligently causes injury in his use or storage of his weapon, has

---

[1]  See, for example, "Firearms Responsibility in the Home," published by the National Shooting Sports Foundation and "A Guide to Firearm Safety" and "Parent's Guide to Gun Safety" published by the National Rifle Association of America.

22

always been subject to suit. The special concurrence's inference that the floodgates of litigation will be opened notwithstanding, our decision here does not invent any new theories of liability. In truth, we have simply articulated a rule of law that has implicitly existed in Montana for decades.

The special concurrence describes Robert and his group as a "roving band of teenage thieves." Assuming, arguendo, that is true, it does not, however, follow that Susanj should thereby be relieved of his obligation to have done something as common sense and simple as removing his gun from his unlocked truck when he left it unattended on a public street or as easy as locking the truck or locking the gun in the glove box, in order to prevent a needless tragedy. Perhaps the next "roving band of thieves" will be a group of curious four-year-olds. Perhaps the next person to get shot while the thieves fight over the gun will not be the thief himself, but a mother strolling her baby in the vicinity of the truck. And, that is precisely the reason why, under the authorities we have cited, Montana law does not hinge duty of care on the status of the victim of the breach of that duty. While, the status of the victim is purely fortuitous, it is completely within the control of the owner of the firearm to safely and prudently use and store his weapon. The law imposes a duty of care, among other things, to encourage responsible conduct, not to set up a lottery that rewards or punishes negligent conduct on the basis of the status of who is injured when that duty of care is breached.

Furthermore, the special concurrence contends that citizens

23

"are not required to foresee the acts of thieves and burglars" and that, therefore, as a matter of law, any intervening criminal act should, without more, automatically cut off liability where a duty of care is breached. First, the special concurrence's basic premise is wrong. Citizens already *do* foresee the potential for criminal acts taking place in their daily lives, and they proceed accordingly. Few members of the public are willing to leave their cars unlocked with the keys in the ignition in a public parking lot for fear that the car will be stolen. Many women when traveling or living alone take precautions to avoid being assaulted. Every person who boards a commercial aircraft is subject to a personal and baggage search because we live in a society where, unfortunately, terrorist attacks are all too foreseeable. It, thus, does not take a crystal ball or a Rhodes Scholar to figure out that if one leaves a firearm and ammunition in an unlocked vehicle on a public street with a veritable candy-store of other goodies in plain view, that some felon just might enter the vehicle unlawfully and make off with the goods and the weapon.

More importantly, however, in our decision on Issue 2, we have not thrown the baby out with the bath water as the special concurrence suggests. We have simply held that:

> If, under the facts of a given case, an intervening criminal act is one which the defendant might reasonably foresee, then there is no reason why the fact finder should not decide causation the same as with any other intervening causation case.

While, one can conjure up all sorts of Rube Goldberg scenarios involving intervening criminal acts, realistically, as our decision

24

here and as <u>VanLuchene</u>, <u>Kiger</u>, <u>Camp</u> (which we have not overruled) and <u>King</u> (which we have clarified) reflect, in many instances intervening criminal acts are unforeseeable and will cut off liability. Notwithstanding, those same cases and our decision in <u>Mills</u> also stand for the proposition that if an intervening criminal act *is* reasonably foreseeable, then liability will <u>not</u> be cut off.

Finally, our opinion on Issue 1 is neither gratuitous nor advisory. As our decision clearly reflects, the District Court granted summary judgment on the basis that Susanj owed no legal duty to Robert Strever. We have concluded that ruling to be erroneous as a matter of law. Without reversing the District Court's decision in that regard we would not have reached Issue 2.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____
Justices

25

Chief Justice J. A. Turnage concurring in part and dissenting in part:

I concur in the result of the majority opinion holding that property owner Tom E. Susanj will not be forced to defend himself in a district court jury trial where he was accused of a tortious act of negligence because thieves entered his property, stole his firearm, and Robert J. Strever, one of the thieves who participated in the theft of Susanj's firearm, was fatally injured.

I respectfully dissent from the majority opinion holding that, as a matter of law, a property owner owes a legal duty to a thief or a burglar who enters property on a mission of thievery, steals the owner's property, and then injures himself or another with the stolen loot.

Based upon the following facts, the District Court concluded that Tom E. Susanj did not owe a legal duty to Robert J. Strever:

> In the early morning hours of May 3 Steven Cline, age 14, Bowen Racine, age 15, and the decedent Robert J. Strever, burglarized vehicles in the area of Eldorado and Fairvale, near the Par 3 Golf Course, including the Defendant Susanj's vehicle. Later Thomas Morris, age 16, saw the three and joined them in returning to the Defendant Susanj's vehicle. Morris took the bag containing the handgun from under the driver's seat of Susanj's vehicle. A dispute exists whether Steven Cline grabbed the gun from Morris or whether Morris merely handed it to him, but in any event Cline obtained possession of the gun and later pulled the trigger and the bullet struck Strever in the head resulting in his death.

The District Court, relying on this Court's precedent in Lencioni v. Long (1961), 139 Mont. 135, 361 P.2d 455; Schafer v. State, Dept. of Institutions (1979), 181 Mont. 102, 592 P.2d 493; and King v. State (1993), 259 Mont. 393, 856 P.2d 954, holding that criminal acts are generally unforeseeable, held that the interven-

26

ing criminal act of one of the thieves was reasonably unforeseeable and no duty was owed by property owner Susanj to Strever.

Our standard of review of a district court's conclusion of law is to determine whether the court's interpretation of the law is correct. In re Estate of Goick (Mont. 1996), 909 P.2d 1165, 52 St.Rep. 12. Under the existing decisions of this Court, the District Judge should be affirmed on his conclusion of law that no legal duty was owed by Susanj to Strever; our standard of review requires affirming.

Our prior decisions, which the majority has overruled on this legal point, had established a rule of law that set the public policy we should follow--a policy based on reason and common sense --that our citizens are not required to foresee the acts of thieves and burglars.

Why, then, does the majority reject our existing public policy and write a new public policy establishing that our citizens now owe a legal duty to thieves and burglars, a breach of such duty subjecting them, at a minimum, to the stress, expense and hazard of a jury trial when a thief or burglar steals from their property or home a firearm, or other object that could produce harm, and injures himself or a fellow thief or burglar? Bad public policy.

In overruling our prior precedent and from the ruling in this case, it does not require a crystal ball or a Rhodes Scholar to foresee that innocent citizens will have their homes burglarized, their vehicles entered, their firearms or other possessions stolen, and that in some cases the thieves and burglars will injure

27

themselves or others with the stolen property. The victimized owners will then be hauled into court to defend themselves against a claim of tortious damages.

In Montana, for reasons of hunting, sport or home protection, many of our citizens own and keep firearms. It will be a real surprise to them to learn that, if they are victimized by a burglar or thief and their firearms are stolen, they may have breached a legal duty and be required to defend themselves in a civil suit for tort damages. Perhaps this decision may be welcomed by those who would ban firearms, as a form of subtle gun control. It is a certainty that the majority of Montanans will not so welcome the majority decision.

I would agree that the owner of a firearm breached a legal duty if he left lying around in his home a loaded firearm, in plain view and accessible to small children lawfully in the home and if one of the children, in handling the firearm, injured himself or another. However, these are not the facts in the case before this Court.

We are here confronted with a roving band of teenage thieves on a mission to break into and steal from several vehicles. The Court's reliance on Limberhand v. Big Ditch Co. (1985), 218 Mont. 132, 706 P.2d 491, to elevate the status of thieves and burglars to that of an invitee, licensee, or civil trespasser is misplaced.

The facts in Limberhand had nothing to do with criminal acts. In Limberhand, a social guest was visiting a tenant in defendant's apartment complex. The tenant's guest was accompanied by her

28

eighteen-month-old child. The child wandered across the apartment parking lot, which separated the apartment complex from an irrigation ditch adjacent to but not on apartment property, and slipped or fell into the ditch, causing the child's death one day later. The ditch was not fenced from the apartment complex.

In Limberhand, this Court said that § 27-1-701, MCA, relating to duty of landowners, made no distinction between social guests, invitees or persons even though they may be trespassers. However, this was stated in reference to such individuals as civil guests, invitees or trespassers and not as to criminal thieves or burglars. Limberhand had nothing to do with and said nothing about such criminals. Now such criminals are joining the list of those to whom property owners owe a legal duty predicated upon claimed negligence.

I acknowledge that we live in a society in which many innocent people are victims of crime. However, if we have reached a stage in our society in which all of us are under a legal duty to foresee that our homes and property will be burglarized, we as Montanans are indeed living in perilous times.

The majority's response to the special concurrence and dissent requires a further comment in support of the dissent.

The dispositive resolution of this appeal is found in Issue 2, where this Court's majority holds that the District Court's grant of summary judgment to defendant Susanj holding him not liable was proper because of the series of intervening acts including two

29

criminal acts of the thieves and one grossly negligent act. I concur with this holding and dispositive resolution of this case.

This Court has on countless occasions stated in its decisions that issues not necessary to the disposition of an appeal need not and will not be discussed. Advisory and gratuitous statements should not be indulged in by this Court. I can only speculate as to why then, the majority of this Court wrote at great length to establish a new public policy that as a matter of law Susanj, as owner of a firearm, has a legal duty to thieves who have stolen the firearm and that not only Susanj but the general public as well has a like duty to thieves.

One other comment must be made in relation to the majority response to the dissent.

The majority states that trespassing, by definition, is criminal, citing Title 45, Chapter 6, MCA. This statement is not accurate and must be clarified. A civil trespass upon premises or land of another does not without more become a criminal trespass. Privilege to enter or remain upon land is extended by the landowner failing to post notice denying entry onto private land. This privilege may be revoked at any time by personal communication of notice by the landowner to the entering person. Only then does such trespass become a criminal misdemeanor. Section 45-6-201, MCA. Premises is defined in § 45-2-101(58), MCA, as including any type of structure or building and any real property.

The distinction between a civil and criminal trespass is clear under the statutes. To be criminal, the trespass requires the requisite act as well as the criminal state of mind of knowingly.

The type of criminal act in this case has nothing to do with the misdemeanor trespass statute. The criminal acts in this case involved entry into Susanj's vehicle and theft of his property.

I would affirm the District Court's conclusion that Susanj could not foresee the criminal act of the thieves and did not breach a legal duty.

_____
Chief Justice

Justice Charles E. Erdmann joins in the dissent of Chief Justice Turnage.

_____
Justice

31