No. 95-496

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

GLENN F. STARKENBURG, for himself
and as Personal Representative of the
Estate of KIMBERLY KELLY STARKENBURG,
on behalf of the heirs and successors of
decedent; APRIL WILLIAMS McCARTY,

Plaintiffs and Respondents,

v.

STATE OF MONTANA,

Defendant and Appellant.

APPEAL FROM:   District Court of the First Judicial District,
In and for the County of Lewis & Clark,
The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Maxon R. Davis (argued), Kevin C. Meek; Davis,
Hatley, Haffeman & Tighe, Great Falls, Montana

For Respondents:

James G. Hunt, James P. Molloy (argued); Dix, Hunt
& Molloy Law Firm, Helena, Montana

Janet L. Rice; Schroeter, Goldmark & Bender,
Seattle, Washington

Ralph A. Alfieri; Law Offices of Ralph A. Alfieri,
Seattle, Washington


Submitted: September 17, 1996

Decided: March 11, 1997
Filed:


_____
Clerk

Justice Karla M. Gray delivered the Opinion of the Court.


The State of Montana (State) appeals from the judgment entered by the First Judicial District Court, Lewis and Clark County, on a jury verdict awarding Glenn and Lois Starkenburg $250,000 in damages plus their costs, the Estate of Kimberly Starkenburg $210,000 in damages plus its costs, and April Williams McCarty $400,000 in damages plus her costs.  We affirm.

We restate the issues on appeal as follows:

1.  Did the District Court err in denying the State's motion for summary judgment and motion for directed verdict?

2.  Did the District Court abuse its discretion in instructing the jury regarding a parole officer's duty?

3.  Did the District Court abuse its discretion in refusing to declare a mistrial?

4.  Did the District Court err in submitting the Starkenburg survival action to the jury and in instructing the jury thereon?

Charles Corliss (Corliss) and an accomplice kidnapped and murdered Donald Hammer, a Montana businessman, in 1965.  Corliss was sentenced to imprisonment for life at the Montana State Prison (Prison) for the execution-style murder and to an additional ten-year sentence for the kidnapping, to be served consecutively to the life sentence.

While at the Prison, Corliss attempted to escape several times.  In one such attempt in 1968, he and other inmates tied up a Prison employee.  Corliss pled guilty to holding a person against his will and received a three-year deferred sentence.  Corliss escaped from the Prison in 1974 and was apprehended nine days later at the home of his wife, Betty Corliss (Betty), in Deer Lodge, Montana.  He pled guilty to escape and received a five-year

sentence to be served consecutively to his sentences for kidnapping and murder.  Corliss also attempted suicide several times while incarcerated and was transferred from the Prison to the Warm Springs State Hospital (Warm Springs) in 1979 as a result of such a suicide attempt.

Corliss was released from Warm Springs in 1983 on a furlough and subsequently was granted parole in 1985.  Corliss' parole carried with it the standard conditions and restrictions, including the prohibition against owning, possessing or being in control of any firearm or other deadly weapon.

From 1986 through the time period relevant here, David Robbins (Robbins) was Corliss' parole officer.  On April 13, 1990, Robbins authorized Corliss to travel to Bellevue, Washington, for a vacation and to look for employment.  Under the written two-week travel permit, Corliss was to reside with his brother-in-law in Bellevue.  Robbins did not verify Corliss' living arrangement in Washington and, indeed, Corliss did not live with his brother-in-law during that time.  Nor did Robbins notify Washington authorities of Corliss' presence there, as is the standard procedure under such circumstances.

Robbins instructed Corliss to visit a parole officer while in Washington, but Corliss failed to do so.  After spending approximately two and a half months in Washington, Corliss sent Robbins a letter dated July 5, 1990, informing Robbins that he was unable to find a parole officer.  Robbins did not take any action to ensure that Corliss comply with his instruction to report to a Washington parole officer.  At that time, Corliss' travel permit had been expired for approximately two months.

During the same time period, Corliss called Robbins from Washington and informed Robbins that he had a girlfriend, Tamera Farrington (Farrington), and that she had obtained a temporary restraining order (TRO) against him for allegedly putting sugar in her gas tank.  Corliss assured Robbins that it was all a misunderstanding.  According to Robbins, Farrington then got on the telephone and reiterated that the TRO was the result of a misunderstanding; Farrington denies that she ever spoke with Robbins on the telephone.  Robbins did not make a record of his conversation with either Corliss or Farrington.

Robbins did not ask Corliss to send him a copy of the TRO or attempt to obtain a copy from Washington authorities.  The TRO was filed on July 5, 1990, and described a number of incidents in which Corliss had acted violently toward Farrington.  Farrington alleged in the TRO that Corliss struck her on two occasions in March of 1990 and repeatedly hit her on two other occasions in April and May of 1990.  She stated that Corliss "threatened to kill [her] and described the places he could 'hide [her] body.'  He threatened [her] family, [and] friends. . . ."  Farrington further alleged that, on July 1, 1990, Corliss backhanded her twice across the

face, put sugar in her gas tank and threatened her life.

Farrington sent Robbins a letter dated July 12, 1990, stating that "[t]his is to assure you that what [Corliss] is telling you is true." She stated that she had no intention of filing charges against Corliss because she could not be sure he was the one who put sugar in her gas tank. Farrington did not mention the allegations contained in the TRO regarding Corliss' violence and threats against her or his threats against her family and friends. Farrington included her address and telephone number at work in the letter. Robbins did not attempt to contact her regarding the TRO or her letter.

Corliss returned to Montana on July 13, 1990, and met with Robbins. Robbins issued Corliss a thirty-day travel permit the same day which allowed Corliss to relocate his family to Washington.

Approximately two weeks later, Robbins received a telephone call from Corliss and his wife, Betty. Corliss informed Robbins that Betty had learned of his affair with Farrington and had threatened him with a gun and a knife at their home. Betty denied threatening Corliss with the weapons. She did express a great deal of anger about Robbins' failure to tell her about Corliss' affair prior to her quitting her job in Montana and relocating to Washington.

Corliss obtained a TRO against Betty on August 1, 1990, and sent a copy of the TRO to Robbins. The TRO described an altercation between Corliss and Betty where Betty "went to a bedroom and took a .38 pistol and said she was going to kill [Corliss]." Although possession of a firearm is a parole violation, Robbins did not investigate whether there was, in fact, a firearm in the Corliss residence.

Corliss contacted Robbins in early October and informed Robbins that he was reconciling with Betty and moving back into their home. Robbins did not ask whether the .38 pistol Corliss had said was involved in the altercation with Betty was still located in the home.

In a letter to Robbins dated October 10, 1990, Corliss stated that Farrington was not going to "quietly go out of [his] life." Five days later, Corliss broke into Farrington's home while she was away and hid until her return.

Farrington arrived home with three friends--Kimberly Starkenburg (Kimberly), April McCarty (April) and Brenda Mahoni (Brenda). Farrington, April and Brenda went directly inside while Kimberly remained outside. Brenda opened a bedroom door and Corliss stepped out and held an "old revolver" to Brenda's face. He made April and Brenda kneel on the floor next to each other. He hit Farrington, knocking her to the floor, and then stepped outside, grabbed Kimberly by the arm and dragged her inside. Corliss made Kimberly kneel on the floor beside April and Brenda.

Farrington got up and ran out the front door. Corliss fired a shot at her, but missed. Corliss then returned to where the three women were kneeling. He shot Kimberly first and then shot April and Brenda. April and Brenda fell to the floor after being shot; Kimberly remained kneeling. Corliss shot Kimberly a second time and she fell to the floor. He then fled out the front door.

April went to Kimberly's aid, trying to get her to speak. April could hear gurgling noises coming from Kimberly which sounded "like she was trying to breathe, catch her breath." April then tried to go out the back door for help. Corliss was hiding in the back yard and, when April opened the door, he shot her a second time. Farrington arrived with the police approximately fifteen to twenty minutes later. Kimberly died as a result of her gunshot wounds. April and Brenda survived; April has a .38 caliber bullet lodged near her spine.

Glenn Starkenburg, individually and as the personal representative of the estate of Kimberly Starkenburg, and April McCarty and her husband, Cary McCarty, (collectively, Starkenburg) filed separate complaints against the State alleging negligence in improperly supervising Corliss. Starkenburg's complaint also stated a survival claim on Kimberly's behalf. By consent of all parties, the cases were consolidated for trial.

A jury trial was held in August of 1995. The jury found that the State was negligent and that its negligence caused Kimberly's injuries and death and April's injuries; it further found that Kimberly's death was not instantaneous. The jury awarded damages against the State accordingly and judgment was entered on the verdict. The State appeals.

Additional facts are set forth below where necessary for our resolution of the issues before us.

DISCUSSION

1. Did the District Court err in denying the State's motion for summary judgment and for a directed verdict?

The State moved for summary judgment in March of 1995, contending that Corliss' criminal acts of shooting Kimberly and April were unforeseeable as a matter of law. It argued that Starkenburg could not establish proximate causation in this case because Corliss' acts constituted an intervening, superseding cause of Kimberly's injuries and death and April's injuries. The District Court denied the motion. After presentation of Starkenburg's case-in-chief, the State moved for a directed verdict on the same basis and the court denied that motion as well.

Although the District Court did not specifically state its rationale for denying the State's motions for summary judgment and for a directed verdict, the court's conclusion that Corliss' criminal acts of shooting Kimberly and April were not unforeseeable as a matter of law was implicit in the denials. We review a district court's conclusion of law to determine if the court's

interpretation of the law is correct.  Werre v. David (1996), 275 Mont. 376, 385, 913 P.2d 625, 631.

The State's argument that Corliss' criminal acts were unforeseeable as a matter of law is premised primarily on its underlying contention that "the intentionally wrongful acts of third parties are simply not viewed as foreseeable, so as to give rise to the imposition of liability upon the State."  We recently clarified, after the trial and briefing on appeal in this case, that the intervening criminal act of a third party may be foreseeable and that, in such cases, the factfinder should decide causation in the same manner as in any other intervening causation case.  Estate of Strever v. Cline (Mont. 1996), 924 P.2d 666, 673-74, 53 St.Rep. 576, 582.

In Estate of Strever, Tom Susanj (Susanj) left his unlocked pickup truck on a street in Billings while he visited his father.  A radar detector, cassette recorder, jumper cables, binoculars, fishing rod, tapes, tool box and camera were left in the pickup's cab; in addition, a handgun and ammunition were under the seat of the pickup in a white bag.  Estate of Strever, 924 P.2d at 668.  Three young boys--Robert Strever (Strever), Steven Cline (Cline) and Bowen Racine (Racine)--entered Susanj's pickup and stole several items.  Cline had been smoking marijuana earlier in the night.  Teenager Thomas Morris (Morris) joined the three boys after seeing them near Susanj's pickup.  Morris removed the handgun and ammunition from beneath the seat in the pickup.  Estate of Strever, 924 P.2d at 668.

Cline subsequently gained control of the gun and waived it around with his finger on the trigger.  While examining it, Cline ejected a live shell from the chamber.  He was trying to remove the ammunition clip from the gun when the gun discharged.  The bullet struck Strever in the head and Strever died.  Estate of Strever, 924 P.2d at 668.  Strever's estate sued Susanj, as well as Cline, Morris and Racine.  The district court granted summary judgment in favor of Susanj and Strever's estate appealed.  Estate of Strever, 924 P.2d at 668.

On appeal, we addressed at length the issue of foreseeability insofar as it relates to the causation element of a negligence case involving intervening criminal acts by third parties.  See Estate of Strever, 924 P.2d at 672-74.  There, Susanj was neither aware, nor had reason to be aware, of any crime problem in the neighborhood where he left his pickup unlocked.  Estate of Strever, 924 P.2d at 668.  We observed that the record reflected two intervening criminal acts by the boys (the two thefts from Susanj's pickup) and grossly negligent intervening acts by Cline (waving the stolen gun around with his finger on the trigger, while high on marijuana, and then trying to unload it).  Estate of Strever, 924 P.2d at 674.  We concluded that reasonable minds could come to but one conclusion--that the series of intervening acts was reasonably

unforeseeable and, therefore, Susanj was not liable for Strever's death as a matter of law. Estate of Strever, 924 P.2d at 674. Accordingly, we held that the district court properly granted summary judgment to Susanj because any negligence by Susanj was superseded by the independent intervening criminal and grossly negligent acts of Cline, Strever, Morris, and Racine. Estate of Strever, 924 P.2d at 674.

Notwithstanding our ultimate holding in Estate of Strever, we emphasized that cases involving intervening superseding acts ordinarily present questions of fact properly left to the trier of fact to resolve. Estate of Strever, 924 P.2d at 674.

If, under the facts of a given case, an intervening criminal act is one which the defendant might reasonably foresee, then there is no reason why the fact finder should not decide causation the same as with any other intervening causation case.

. . . .

[T]rial courts must continue to carefully review each fact situation involving intervening criminal acts on a case-by-case basis, and it is only where reasonable minds could come to but one conclusion, that this issue is properly disposed of as a matter of law.

Estate of Strever, 924 P.2d at 674. Thus, contrary to the State's assertion in the present case, intervening criminal acts of third persons are not automatically unforeseeable as a matter of law. Rather, such acts must be addressed in the foreseeability context on a case-by-case basis.

Here, numerous facts relating to the foreseeability of Corliss' criminal acts during the relevant time period of his parole were before the District Court at the time of the summary judgment proceedings. Under both travel permits issued by Robbins, Corliss remained in Washington beyond the time allowed and Robbins took no corrective action. When Robbins issued the April 13, 1990, permit, he ordered Corliss to visit a parole officer while in Washington. Corliss failed to do so and, notwithstanding Robbins' knowledge of Corliss' failure to comply, Robbins took no action.

In addition, Robbins knew that Corliss had a girlfriend, Farrington, who had obtained a TRO against Corliss in July of 1990. Robbins did not attempt to obtain a copy of the TRO or investigate the circumstances surrounding the TRO. Robbins' deposition testimony established that he could have obtained the Farrington TRO, but he "never thought about gaining access to it." Had Robbins obtained a copy of the TRO, he would have learned that Farrington alleged that Corliss was violent toward her on numerous occasions and had threatened to kill her and her family and friends.

In late July of 1990, Corliss alerted Robbins that an altercation had occurred between himself and Betty, during which

Betty retrieved a gun from a bedroom of their home.  Robbins received a copy of a TRO obtained by Corliss against Betty which contained a statement to the same effect.  Even though Corliss was subject to a parole condition which prohibited the possession of a firearm, Robbins neither confronted Corliss about the possible firearm possession nor investigated the presence of a gun in the Corliss household.

Faced with the foregoing facts, the District Court implicitly concluded that Corliss' criminal acts were not unforeseeable as a matter of law.  As discussed above, such a conclusion will be correct in the usual case; a determination to the contrary--that intervening criminal acts were unforeseeable as a matter of law--is appropriate only where reasonable minds could reach but one conclusion regarding foreseeability.  See Estate of Strever, 924 P.2d at 674.

Unlike Estate of Strever, the issue of causation in the present case is not susceptible to determination as a matter of law.  There, the record was devoid of any facts from which a jury could determine that Susanj should have foreseen the series of intervening criminal and grossly negligent acts of the minor boys.  Here, however, Robbins was confronted with facts that indicated that Corliss--a convicted execution-style murderer--may have had a .38 pistol in his home.  Moreover, Robbins had access to Farrington's TRO which contained allegations of violence by Corliss against Farrington, as well as threats against Farrington and her family and friends.  Based on the facts of this case, a jury properly could find that Robbins could reasonably have foreseen criminal acts of violence against Farrington and her friends.  Therefore, the Strever test for unforeseeability of intervening criminal acts as a matter of law--that reasonable minds could come to but one conclusion--was not met here and the issue of proximate causation properly was left for the jury.

In support of its "unforeseeability as a matter of law" argument and its contention that the District Court erred in this regard, the State relies on VanLuchene v. State (1990), 244 Mont. 397, 797 P.2d 932; Kiger v. State (1990), 245 Mont. 457, 802 P.2d 1248; U.S. Fidelity and Guar. Co. v. Camp (1991), 253 Mont. 64, 831 P.2d 586; and King v. State (1993), 259 Mont. 393; 856 P.2d 954.  We discussed and distinguished these cases in Estate of Strever which, as mentioned above, was not available to the State when briefing the present case for appeal.  The cases are equally distinguishable from the present case and do not support a determination that Corliss' criminal acts were unforeseeable as a matter of law.  We review them only briefly below.

In VanLuchene, Robert Hornback was released from prison after serving his entire sentence for felony sexual assault.  VanLuchene, 797 P.2d at 933.  Several months later, he sexually assaulted and killed eight-year-old Ryan VanLuchene.  VanLuchene's family sued

the State, alleging that it negligently failed to satisfy its statutory duty of rehabilitating Hornback. The district court dismissed the plaintiffs' complaint and the plaintiffs appealed. VanLuchene, 797 P.2d at 933-34.

Like the present case, VanLuchene involved intervening criminal acts by a third party. We concluded, however, that the State did not owe a duty to the plaintiffs because, once Hornback served his entire sentence, the State was required to release him. See VanLuchene, 797 P.2d at 936. Accordingly, we did not analyze Hornback's intervening acts in the context of causation on appeal. Thus, VanLuchene is not applicable here.

In Kiger, Danny Arledge shot and critically injured Katrina Kiger while trying to steal her car approximately eighteen days after being paroled from prison. Prison authorities had miscalculated when Arledge would be eligible for parole and, as a result, he still should have been in prison on the day of the shooting. Kiger, 802 P.2d at 1249. Kiger sued the State for negligence and the district court granted summary judgment to the State. Kiger, 802 P.2d at 1249.

The foreseeability of Arledge's criminal act of shooting Kiger was at issue on appeal. Kiger, 802 P.2d at 1249-51. We noted that, in order for the State's negligence in prematurely paroling Arledge to be the proximate cause of Kiger's injuries, the State must have been able to reasonably foresee the consequences of its negligence. Kiger, 802 P.2d at 1251 (citation omitted). Under the facts before us, we concluded that there were too many "what ifs" that were superseding events, breaking the chain of causation between the State's miscalculation and Kiger's injuries. Kiger, 802 P.2d at 1251.

Our decision in Kiger was premised on the specific facts of that case. Unlike the present case, the record before us in Kiger was devoid of evidence indicating that Arledge's criminal acts were reasonably foreseeable by the State. See Kiger, 802 P.2d at 1250-51.

In Camp, Randall Broadbrooks pled guilty to driving under the influence of alcohol, fourth offense, and driving while a habitual traffic offender. He was sentenced to one year in the county jail and participated in a work release program under which he was released from jail from 8:00 a.m. until 5:00 p.m. each weekday. Camp, 831 P.2d at 587.

On a Friday evening, Broadbrooks went to his apartment instead of returning to jail and the police were unable to locate him. He apparently fell asleep while smoking a cigarette. The cigarette fell and ignited a couch, resulting in a fire which damaged the apartment building. The insurer for the owners of the apartment building sued the Phillips County Sheriff, Mike Camp, for negligence, attempting to recover money paid to its insureds as a result of the fire. The district court granted Camp's motion for

summary judgment and the plaintiff appealed. Camp, 831 P.2d at 587-88.

On appeal, we noted that Camp could be held liable only if Broadbrooks' act of falling asleep while smoking a cigarette in his apartment was reasonably foreseeable. We concluded that it was not and, therefore, that Broadbrooks' act was a superseding cause of the plaintiff's injuries. Camp, 831 P.2d at 590.

The record before us in Camp did not contain any evidence forewarning that Broadbrooks might accidently start a fire at his apartment. In the present case, however, the record contains sufficient evidence to raise a question of fact for the jury as to whether Corliss' criminal acts against Farrington and her friends were foreseeable.

In King, Victor Buddell was involuntarily committed to Warm Springs for a three-month term. A recommitment hearing was held several months later and the district court determined that, while Buddell was a danger to himself, the least restrictive environment for him was a conditional release to the community. The State did not appeal the release order. Less than a month after his release, Buddell killed David King. King, 856 P.2d at 955. King's parents sued the State for negligence and the district court dismissed the complaint for failure to state a claim, concluding that the State did not have a duty to appeal the release order. King, 856 P.2d at 955.

On appeal, we noted that a statute permitted the State to appeal, but that the statute was not mandatory. On that basis, we concluded that the State did not have a duty to appeal the release order. We also concluded that Buddell's act was not reasonably foreseeable by the State and stated that, when an injury is caused by a third party's intervening act, the defendant's negligent actions cannot be the proximate cause of the injury. King, 856 P.2d at 956-57.

In the present case, the State relies on our statement in King that, "if a plaintiff's injury is caused by the intervening act of a third-party, the defendant's actions cannot be viewed as the proximate cause of that injury." See King, 856 P.2d at 956 (citing Graham v. Montana State Univ. (1988), 235 Mont. 284, 289-90, 767 P.2d 301, 304)(emphasis added). We overruled that statement from King in Estate of Strever, however, noting that Graham did not support our use of the word "cannot" regarding intervening acts of third parties. Estate of Strever, 924 P.2d at 673.

The State's reliance on VanLuchene, Kiger, Camp, and King is misplaced. Based on the record in this case, we hold that the District Court was correct in implicitly concluding that Corliss' criminal acts of shooting Kimberly and April were not unforeseeable as a matter of law and in denying the State's motion for summary judgment.

As set forth above, the State renewed its "unforeseeable as a

matter of law" argument at the close of Starkenburg's case-in-chief via a motion for a directed verdict.  The District Court denied the motion.

A directed verdict is proper only when there is a complete absence of any evidence which would justify submitting an issue to a jury.  Werre, 913 P.2d at 630.  Here, our conclusion that the facts in this case would support a finding that Robbins could reasonably have foreseen criminal acts of violence by Corliss against Farrington and her friends establishes that there was evidence to justify submitting the causation issue to the jury.  On that basis, we hold that the District Court properly denied the State's motion for a directed verdict.

2.  Did the District Court abuse its discretion in instructing the jury regarding a parole officer's duty?

The State argues that, in both giving and refusing certain instructions, the District Court failed to properly instruct the jury on the duty of a parole officer.  A district court has discretion in instructing the jury and we will not reverse the court on the basis of alleged instructional errors absent an abuse of discretion.  Werre, 913 P.2d at 635 (citation omitted).

The State contends that the District Court erred in giving Instruction Nos. 9 and 14, both of which relate to duty.

Instruction No. 9 states:

Every person is responsible for injury to the person of another caused by his negligence.
Negligence is the failure to use reasonable care.
Negligence may consist of action or inaction.  A parole officer is negligent if he fails to act as an ordinarily prudent parole officer would act under the circumstances.

Instruction No. 14 reiterates a parole officer's "duty to exercise reasonable care to control" a parolee.  According to the State, these instructions are incorrect statements of Montana law on a parole officer's duty because Robbins owed no duty to Starkenburg.  Whether a legal duty exists is a question of law to be determined by the district court.  Estate of Strever, 924 P.2d at 669 (citation omitted).  Thus, we review the challenged instructions to determine whether they correctly state the law on a parole officer's duty in this case.

The first three sentences of Instruction No. 9 merely restate the principles of negligence contained in Montana statute and case law.  For example,  27-1-701, MCA, states that, except as otherwise provided by law, "everyone is responsible . . . for an injury occasioned to another by his want of ordinary care . . . [;]" similarly, under  1-1-204(4), MCA, negligence "denote[s] a want of the attention to the nature or probable consequences of the act or omission that a prudent man would ordinarily give in acting in his own concerns."  Our cases repeatedly reiterate that, ordinarily, negligence involves the failure of an actor to use

reasonable care. See, e.g., Estate of Strever, 924 P.2d at 670-71; Jacobsen v. State (1989), 236 Mont. 91, 769 P.2d 694.

The general principles of negligence contained in Instruction No. 9 are correct statements of Montana law and, indeed, the State does not contend otherwise. The State's assertions of legal error with regard to Instruction Nos. 9 and 14 relate to the portions of those instructions which apply these general negligence principles to a parole officer.

We observe at the outset that the State cites to no Montana statute or case law providing an exception for parole officers from the duty generally imposed by 27-1-701, MCA. Moreover, parole of inmates from the Prison and the status and supervision of parolees thereafter are governed by statute in Montana. The parole of an imprisoned person involves release to the community prior to the expiration of the prison sentence imposed. See 46-1-202(15), MCA. "A prisoner while on parole remains in the legal custody of the institution from which the prisoner was released but is subject to the orders of the [Board of Pardons and Parole]." Section 46-23-215(1), MCA. The Department of Corrections "retain[s] custody of all persons placed on parole and shall supervise the persons during their parole periods in accordance with the conditions set by the board." Section 46-23-1021(1), MCA. Thus, in Montana, a parolee remains in the State's "custody" and the meaning of "custody" is interwoven with defining the State's duty with regard to parolees.

The legislature has not defined "custody" in the parole context. Custody generally is defined as "judicial or penal safekeeping: control of a thing or person with such actual or constructive possession as fulfills the purpose of the law or duty requiring it. . . ." Webster's Third New International Dictionary, 559 (1971). Similarly, Black's Law Dictionary, 460 (1968) defines custody as "[d]etention; charge; control; possession. The term . . . may mean actual imprisonment . . . or mere power, legal or physical, of imprisoning or of taking manual possession." Interpreting 46-23-215(1) and 46-23-1021(1), MCA, according to the plain and ordinary meaning of the language used therein, as we must (see Werre 913 P.2d at 631), it is clear that the State continues to have control over parolees after release from the Prison. Furthermore, the State is statutorily required to supervise parolees--that is, persons in its custody and over whom it has power and control--according to the parole conditions imposed. Section 46-23-1021(1), MCA.

Instruction No. 9 does nothing more than apply general negligence standards to parole officers in supervising parolees. Moreover, it does so in a manner entirely consistent with applicable statutes. Similarly, Instruction No. 14 merely imposes a duty to exercise reasonable care to control a parolee who already is, by statute, subject to that control.

Nor does the foreseeability component of duty weigh against the existence of a duty in this case. We recently discussed at length, and clarified, Montana law regarding foreseeability insofar as it relates to the duty element of negligence. See Estate of Strever, 924 P.2d at 670-72; Busta v. Columbus Hosp. Corp. (1996), 276 Mont. 342, 916 P.2d 122. We stated that

[f]oreseeability is of prime importance in establishing the element of duty. . . . If a reasonably prudent defendant can foresee neither any danger of direct injury nor any risk from an intervening cause he is simply not negligent.

. . . .

[Since duty] is inherently intertwined with foreseeability, such duty or obligation must necessarily be adjudicated only upon a case-to-case basis.

Busta, 916 P.2d at 134 (quoting Mang v. Eliasson (1969), 153 Mont. 431, 437-39, 458 P.2d 777, 781-82).

Considerations of foreseeability in the duty context are directed to the foreseeability of the risk involved with the conduct at issue. See Estate of Strever, 924 P.2d at 671-72. Indeed,

[t]he obligation of defendants turns on whether:
". . . the offending conduct foreseeably involved unreasonably great risk of harm to the interests of someone other than the actor. . . . Duty, in other words, is measured by the scope of the risk which negligent conduct foreseeably entails."
. . . And absent foreseeability, there is no duty owed by defendants to plaintiff. . . .

Busta, 916 P.2d at 134 (quoting Mang, 458 P.2d at 781-82)(emphasis added).

In this case, the conduct at issue is Robbins' supervision of Corliss, a parolee originally convicted and sentenced to a life sentence at the Prison for an execution-style murder. Both the State and Starkenburg agree that the primary responsibility of a parole officer in supervising a parolee is the protection of society. In this regard, Robbins conceded at trial that an execution-style murderer should be supervised more closely than other types of parolees because of the potential danger posed by such a parolee.

On this record, it is clear that any negligent supervision by Robbins of Corliss foreseeably involved an unreasonably great risk of harm to persons other than Robbins generally and to Farrington and those close to her in particular. Furthermore, given that Montana statutes maintain parolees in legal custody and require parole supervision in accordance with the parolee's conditions of

parole, Robbins clearly had a duty to exercise reasonable care to control Corliss and prevent him from doing such harm.

Finally, we take note of--and reject--the State's "sky is falling" arguments in this regard.  Such arguments are not based on the law and have no place in a case involving fundamental principles of law and application of controlling statutes.  Moreover, a duty to exercise reasonable care when the unreasonable risk of harm in failing to do so is foreseeable is hardly an extraordinary burden; such a duty is not--as the State is well aware--the equivalent of a duty to exercise 24-hour-a-day control.

Considering Instruction Nos. 9 and 14 in light of general negligence principles and Montana statutes which relate to parole and impose an affirmative duty to supervise, we conclude that they correctly state Montana law regarding a parole officer's duty.

The State also asserts error in the District Court's refusal of three of its proposed jury instructions based on the Restatement (Second) of Torts    315 and 319 (1965).  The State's proposed jury instruction no. 16 states:

The State does not have a duty to control or take charge of a parolee to prevent him from doing harm to a third party victim unless a special relationship exists between the parole officer and the third party victim such that the parole officer would know or have reason to know that the specific identifiable third party victim would be the object of harm by the parolee.  The above-described duty exists only to specifically identifiable individuals and is not a duty to protect the public at large.

Proposed instruction no. 18 provides:

A parole officer has no duty to control the conduct of a parolee to prevent him from causing physical harm to another unless:

(a) a special relationship exists between the parole officer and the parolee which imposes a duty upon the parole officer to control the parolee's conduct, or

(b) a special relationship exists between the parole officer and the third party victim which gives to the third party victim a right to protection.

Finally, the State's proposed instruction no. 19 reads:

A parole officer who takes charge of a parolee whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the parolee to prevent him from doing such harm.

The State contends that these proposed instructions correctly state

the law applicable to its duty in the present case and negate the existence of any duty because no "special relationship" or "control" existed and Robbins did not "take charge" of Corliss. On the face of it, these proposed instructions do not appear to be entirely consistent with either the Montana statutes governing parole or the foreseeability component of duty discussed above. In any event, however, we have not previously adopted the Restatement principles on which the proposed instructions were based and, given our conclusion above that Instruction Nos. 9 and 14 correctly state Montana law applicable to this case, we need not address them further here.

The State also asserts error in the District Court's refusal of its proposed instruction no. 17. Review of that proposed instruction reveals that it is an instruction on cause in fact and proximate cause which is unrelated to the legal question of the existence of a duty in this case. The State did not present an argument regarding this instruction under any issue involving causation; as a result, we do not address it.

We hold that the District Court did not abuse its discretion in instructing the jury on Robbins' duty in this case.

### 3. Did the District Court abuse its discretion in refusing to declare a mistrial?

During trial, April testified regarding the gun Corliss used to shoot her, Kimberly and Brenda. She testified that the gun was old and that it looked like a gun from a western movie; she noted that Corliss had to pull back the hammer before firing each shot. April also testified that the gun was from the 1800s and that

> [t]he expert witness that testified at [Corliss' criminal trial in Washington] said because of the grooves in the bullet, the slug that came through [her], and the depth of them, it was an older gun. It hadn't been cleaned for quite sometime, over many years and it had worn grooves into it to make the grooves into the slug.

The State timely objected to this latter testimony and the District Court overruled the State's objection. The court also denied the State's related motion to strike the testimony regarding the year the gun was manufactured.

A week later, as the trial was drawing to a close, the State moved for a mistrial. In addition to renewing its argument that April's testimony was inadmissible, the gravamen of the State's motion was an allegation that Starkenburg's counsel had knowingly presented false testimony by April. In this regard, the State advised the District Court that it had obtained a transcript of Corliss' criminal trial and that the expert witness did not testify that the gun Corliss used was from the 1800s or was an older gun. The allegation of knowing presentation of false testimony was

premised on the fact that Starkenburg's counsel already had obtained the transcript and, therefore, had known all along--and concealed from the court--that April's testimony was false. Starkenburg's counsel denied knowingly presenting false testimony. He stated that, while April's recollection of the expert testimony at the criminal trial may have been erroneous, she left Corliss' criminal trial with the impression that the gun was a late 1800s gun.

The District Court reviewed April's testimony and the testimony at issue from Corliss' criminal trial. It concluded that April's erroneous characterization of the criminal trial record was based on her own impressions of what she heard at that trial. On that basis, the court rejected the State's contention that Starkenburg's counsel knowingly put on false testimony and denied the State's motion for a mistrial.

Raising again both the inadmissibility of April's testimony and the knowing presentation of false testimony by Starkenburg's counsel, the State argues on appeal that the District Court erred in refusing to grant a mistrial. We review a trial court's denial of a motion for mistrial in a civil case for abuse of discretion. Dees v. American Nat'l Fire Ins. Co. (1993), 260 Mont. 431, 443, 861 P.2d 141, 148 (citing Kuhnke v. Fisher (1987), 227 Mont. 62, 68, 740 P.2d 625, 628). We address the State's arguments on admissibility and knowing presentation of false testimony in turn.

Admissibility of April's Testimony

Determinations of the admissibility of evidence are within the sound discretion of the trial court. In re Marriage of Lopez (1992), 255 Mont. 238, 245, 841 P.2d 1122, 1126 (citing Cooper v. Rosston (1988), 232 Mont. 186, 756 P.2d 1125). Absent an abuse of discretion, we will not reverse a district court's ruling on the admissibility of evidence. See Werre, 913 P.2d at 633.

Hearsay is "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), M.R.Evid. April's testimony regarding the expert witness testimony from Corliss' criminal trial was clearly a statement other than one made by the declarant while testifying at trial. Starkenburg does not argue that the testimony was not offered to prove the truth of the matter asserted and does not contend that it falls within one of the exceptions to the hearsay rule; indeed, Starkenburg concedes that April's testimony in this regard was inadmissible hearsay. Thus, we conclude that the District Court abused its discretion in admitting the testimony over the State's objection.

The question remains, however, whether the court's abuse of discretion constitutes reversible error. See Marriage of Lopez, 841 P.2d at 1126. An error in the admission of evidence is harmless and, as a result, does not warrant reversal unless the substantial rights of the complaining party have been materially

affected. Rule 61, M.R.Civ.P.; Marriage of Lopez, 841 P.2d at 1126.

Here, the District Court provided the State with an opportunity to impeach April's testimony via the transcript from the criminal trial. In addition, Starkenburg recalled April as a witness and she testified that she had been mistaken and did not know the manufacture date of the gun.

Moreover, the record before us contains other evidence regarding the gun used by Corliss. April testified without objection by the State that the gun was an "old revolver" and looked like a gun from a western movie. Farrington testified that Corliss had several "antique guns." Furthermore, April has a .38 caliber bullet lodged near her spine as a result of Corliss' attack and Corliss' TRO against Betty stated that he and Betty had a .38 revolver in their home. On this record, April's inadmissible testimony was merely cumulative and, as such, it did not affect the State's substantial rights. See Hansen v. Hansen (1992), 254 Mont. 152, 160, 835 P.2d 748, 753; Thompkins v. Fuller (1983), 205 Mont. 168, 186, 667 P.2d 944, 953. Accordingly, we conclude that the District Court's admission of April's testimony was harmless error.

### Mistrial Motion

The State argues that Starkenburg presented knowingly false testimony by April and, therefore, a mistrial was the only adequate remedy. The District Court considered the parties' oral arguments, reviewed April's testimony and the expert testimony from Corliss' criminal trial, and concluded that April's testimony was based on her overall impression from the criminal trial and an imperfect memory.

The District Court's rejection of the State's "knowingly false testimony" argument necessarily involved not only a review of transcripts, but a weighing of the credibility of both April and Starkenburg's counsel. We consistently have held that a trial court acting as a finder of fact is in the best position to determine the credibility of witnesses, because it observes the witnesses and their demeanor in person; we are presented with only a "cold record" for review. See Matter of Seizure of $23,691.00 in U.S. Currency (1995), 273 Mont. 474, 485, 905 P.2d 148, 155 (citing State v. Flack (1993), 260 Mont. 181, 189, 860 P.2d 89, 94); Walden v. State (1991), 250 Mont. 132, 141-42, 818 P.2d 1190, 1196; Kartes v. Kartes (1977), 175 Mont. 210, 216-17, 573 P.2d 191, 195. Here, the District Court observed April during the testimony at issue and Starkenburg's counsel during the response to the State's allegation of knowing presentation of false testimony; having done so, it determined that no false testimony had been presented knowingly.

The State's argument on appeal amounts to no more than a request that this Court substitute its judgment for that of the District Court regarding whether false testimony was presented knowingly. We do not substitute our judgment for that of a trial

court on such matters. Seizure of $23,691.00, 905 P.2d at 155 (citations omitted).

We hold that the District Court did not abuse its discretion in refusing to declare a mistrial.

4. Did the District Court err in submitting the Starkenburg survival action to the jury and in instructing the jury thereon?

A cause of action which exists during a person's lifetime survives upon his or her death. See 27-1-501, MCA; Swanson v. Champion Int'l Corp. (1982), 197 Mont. 509, 515, 646 P.2d 1166, 1169. As a corollary, the decedent's cause of action, commonly called a survival action, cannot be pursued if the decedent's death was instantaneous. Swanson, 646 P.2d at 1169; see also Burns v. Fisher (1957), 132 Mont. 26, 30, 313 P.2d 1044, 1047.

[Where there] is not any appreciable length of time between the wrong and the death, or, in other words, the wrong and the death being coincident in point of time, the instant the wrong is committed the victim of the wrong has ceased to exist, [then] it seems impossible that there is any cause of action in favor of such victim. This conclusion seems inevitable when the elements which are to be considered in determining the measure of damages are taken into account.

Dillon v. Great N. Ry. Co. (1909), 38 Mont. 485, 496, 100 P. 960, 963. The personal representative of the decedent's estate may pursue a survival action on behalf of the decedent's estate and all damages recoverable in such an action are personal to the decedent. Swanson, 646 P.2d at 1169.

The plaintiff in a survival action has the burden of proving that the death was not instantaneous (see Burns, 313 P.2d at 1047), or, in other words, that the decedent survived the injury for an appreciable amount of time (see Dillon, 100 P. at 963). "[A]n appreciable amount of time" can be as short as a few seconds. See Stephens v. Brown (1972), 160 Mont. 453, 460, 503 P.2d 667, 670-71.

Submission of Survival Action to Jury

Prior to the end of trial, the State apparently made a motion in the nature of a motion for a directed verdict, arguing that there was insufficient evidence to present Kimberly's survival action to the jury. The District Court denied the motion in chambers prior to convening court on the last morning of trial. The State contends that the court erred.

A directed verdict is proper only when there is a complete absence of any evidence which would justify submitting an issue to a jury, and all inferences which can be drawn from the evidence must be considered in a light most favorable to the opposing party.

Werre, 913 P.2d at 630 (citation omitted). Whether there is sufficient evidence to send a cause of action to the jury is a question of law. Collins v. Itoh (1972), 160 Mont. 461, 472, 503 P.2d 36, 42 (citation omitted). We review a district court's conclusion of law to determine whether the court's interpretation of the law is correct. Werre, 913 P.2d at 631.

The State premises its argument that the survival action should not have gone to the jury on Starkenburg's failure to introduce medical evidence as to the cause or time of Kimberly's death; it points out that no testimony was presented regarding whether the gurgling noises April heard from Kimberly after Kimberly was shot the second time represented a sign of life. Accordingly, the State argues that "[t]here was simply no evidence that Kim Starkenburg lived for any appreciable period of time after she was shot." We disagree.

The record contains evidence that Kimberly remained kneeling beside Brenda and April after Corliss shot her and while he shot Brenda and April. Corliss then shot Kimberly a second time and she fell to the floor. Corliss subsequently fled from Farrington's residence and, when he had gone, April went to Kimberly's aid. According to April, she could hear gurgling sounds from Kimberly which sounded "like she was trying to breathe, catch her breath."

Starkenburg's evidence in support of the survival action and the length of time Kimberly survived was not particularly strong and the jury could well have chosen to reject it. The evidence was sufficient, however, to support a finding that Kimberly's death was not instantaneous and that she survived for more than a few seconds. See Burns, 313 P.2d at 1047; Dillon, 100 P. at 963.

Moreover, the State cites to no authority under which a plaintiff in a survival action must present medical evidence to prove that death was not instantaneous or that the decedent survived for an appreciable amount of time. While the State correctly observes that, in Stephens, there was medical evidence that the decedent lived for a few seconds to a few minutes (see Stephens, 503 P.2d at 670), nothing in Stephens requires, or even suggests, that evidence regarding the length of time between injury and death must be expert medical testimony.

We hold that the District Court did not err in concluding that there was sufficient evidence to submit Kimberly's survival action to the jury and in denying the State's motion for a directed verdict.

Jury Instruction

The State argues that the District Court erred in instructing the jury on the survival action. As previously stated, a district court has discretion in instructing the jury and we will not reverse the court on the basis of alleged instructional errors absent an abuse of discretion. Werre, 913 P.2d at 635 (citation omitted).

Instruction No. 20, as given by the District Court to the jury, provides:

If you find that Kimberly Starkenburg's death was not instantaneous, your award to her estate should include the present value of her reasonable earnings after the date of death during the remainder of her life expectancy; and reasonable compensation for decedent's conscious mental and physical pain and suffering in the interval between injury and death.

The State objected to the giving of any instruction at all on the survival action, arguing that it was error "to instruct the jury on a survivorship action for [Kimberly's] estate where there is no credible evidence within the record of this case to allow [a] survivorship action to go to the jury." In other words, the State's objection mirrored the basis for its motion for a directed verdict, which the District Court previously had denied. We concluded above that there was sufficient evidence of record to submit the survival action to the jury. For the same reason, we conclude that the District Court did not abuse its discretion in giving Instruction No. 20 over the State's objection.

The State subsequently advanced two objections to the substance of Instruction No. 20, one in the District Court and one in this Court on appeal. The additional objection to the instruction in the District Court was made after the jury had been instructed, but before deliberations began. The State's argument was, at best, confusing and is susceptible of two interpretations. The State may have been arguing that the question of whether death was instantaneous was a threshold legal question for the trial court; alternatively, it may have been arguing that the jury was required to find affirmatively that Kimberly "lived for an appreciable amount of time" rather than to find, in the language of Instruction No. 20, that Kimberly's "death was not instantaneous." On appeal, the State argues that Instruction No. 20 was erroneous in two respects relating to Starkenburg's burden of proof on the survival action.

We need not address the timeliness of the State's substantive objection to the instruction in the District Court after the jury had been instructed. We also need not concern ourselves with attempting to ascertain the precise nature of that objection or whether any authority exists in support of the objection regardless of which way it is read. Finally, we need not resolve whether the State's burden of proof contentions on appeal with regard to Instruction No. 20 constitute a change in theory on appeal or an issue raised for the first time on appeal.

Rule 51, M.R.Civ.P., provides that "[n]o party may assign as error the failure to instruct on any point of law unless that party offers an instruction thereon." Here, the essence of the State's

substantive objections in the District Court and this Court is that the trial court should have instructed the jury that it was necessary to find that Kimberly lived an appreciable amount of time before damages could be awarded on the survival claim.  The State did not propose an instruction on this point, however; indeed, it did not propose any instructions relating to the survival action.  Thus, it cannot assign as error the District Court's failure to instruct specifically on the "appreciable amount of time" element of a survival action.  See Werre, 913 P.2d at 636.

The State maintains that Rule 51, M.R.Civ.P., does not preclude it from asserting substantive errors relating to Instruction No. 20 because of the timing of instruction-related matters in the District Court.  It states that it did not have an opportunity to offer instructions because the court only decided on the final day of trial to give a survival instruction and, at the time the court advised counsel of the substance of that instruction, the instruction was not available in written form for review. Based on the record before us, we reject the State's effort to avoid the application of the Rule 51, M.R.Civ.P., bar.

The trial of this case was scheduled for August 7, 1995.  On July 21, 1995, the District Court advised the parties that proposed instructions were to be submitted as soon as possible.  Starkenburg submitted proposed instruction nos. 1 through 37 on July 20, 1995; the State filed proposed instruction nos. 1 through 28 on the same day.  Thereafter, and through August 16, the parties submitted additional proposed instructions.

Starkenburg's proposed instruction no. 37, submitted on July 20, 1995, was a proposed instruction on damages in the event the jury had found for plaintiffs on the question of liability.  With regard to the survival action, that proposed instruction provided as follows:

(4) Your award should include reasonable compensation to decedent's estate for:
reasonable compensation for damages suffered by decedent if you find death was not instantaneous.

(Emphasis added.)  The cited source for the entire proposed instruction was Montana Pattern Jury Instructions (MPI) 25.20 through 25.25 (Civil).  The quoted portion of Starkenburg's proposed instruction no. 37 is, in fact, a verbatim reiteration of MPI 25.25, captioned "Damages--Survival Action."  Thus, as of July 20, 1995, the State knew, or should have known, that the "not instantaneous" language was being proposed with regard to the survival action; indeed, the State should have known that the language was taken directly from the MPI.  Notwithstanding the content of this proposed instruction, the State did not submit a supplemental proposed instruction containing the "appreciable amount of time" language with others it filed on August 14, 1995.

In addition, the District Court and the parties began settling instructions informally on the evening before the final day of trial; the "not instantaneous" proposed instruction was before the court and the State at that time. Prior to convening court the following morning, the District Court ruled on pending motions and, as the State correctly maintains, advised the parties that it was revising the proposed instruction to add a clarification that, if the jury found that Kimberly's death was not instantaneous, it should include various elements of damages in its award to her estate. While the revised instruction was not available in written form for review, it is clear from our brief summary of the record that the "not instantaneous" language was not a new addition which prevented the State from proposing instructions on the issue. Indeed, Instruction No. 20, as given to the jury, provided in pertinent part:

If you find that Kimberly Starkenburg's death was not instantaneous, your award to her estate should include [various elements of damages].

(Emphasis added.) This language is a mere reordering of the language contained in Starkenburg's proposed instruction no. 37 to clarify that the jury could not award damages in the survival action unless it had first determined that death was not instantaneous.

The State's final argument regarding its failure to offer a proposed instruction countering the "not instantaneous" language is that the District Court only decided on the final day of trial to instruct on the survival action; it seems to suggest that it was caught unaware for purposes of applying Rule 51, M.R.Civ.P., because the District Court did not rule on its pending motion for a directed verdict on the survival action until that day. This argument is entirely without merit. Neither the State nor any other party can fail to offer proposed instructions on a pleaded claim in the hopes of obtaining a directed verdict and then, after such a motion is denied, bootstrap itself around application of Rule 51, M.R.Civ.P. On this record, it is clear that Rule 51, M.R.Civ.P., bars the State from asserting error regarding the substance of Instruction No. 20. Accordingly, we hold that the District Court did not abuse its discretion in instructing the jury on the survival action.

Affirmed.

/S/ KARLA M. GRAY

We concur:

```
                 /S/  J. A.  TURNAGE
                /S/  JAMES C. NELSON
              /S/  TERRY N. TRIEWEILER
              /S/  W. WILLIAM LEAPHART
                    /S/  ED McLEAN
              Judge of the District Court,
         sitting for Justice William E. Hunt, Sr.
```