NO.  94-060

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

IDA M. MILLS,

    Plaintiff and Appellant,

-v-

TOM MATHER, d/b/a TOM MATHER &
ASSOCIATES CO., DARLENE THOMAS,
FIRST MONTANA TITLE COMPANY OF
GREAT FALLS,

    Defendants,

    and

J. BRIAN TIERNEY,

    Defendant and Respondent.

FILED

MAR 07 1995

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the Eighth Judicial District,
             In and for the County of Cascade,
             The Honorable Joel G. Roth, Judge presiding.


COUNSEL OF RECORD:

       For Appellant:

           Keith Tokerud, John McCarty, Scott & Tokerud, Great
           Falls,  Montana

       For Respondent:

           L. Neil Axtell, Axtell & Briggs, Spokane, Washington


                Submitted on Briefs:    December 1, 1994

                        Decided:    March 7, 1995

Filed:

_____
          Clerk

Justice Fred. J. Weber delivered the Opinion of the Court.

This is an appeal by Ida M. Mills (Mills) from an order of the Eighth Judicial District Court, Cascade County, granting summary judgment to defendant J. Brian Tierney (Tierney). The court granted summary judgment to Tierney on Mills' claim that he negligently represented her interests concerning a real estate transaction involving a contract for deed. Mills lost over $30,000 when the escrow agent embezzled money intended to pay off the contract. We reverse and remand.

The sole question on appeal is whether the District Court erred in granting defendant Tierney's motion for summary judgment.

The extensive deposition testimony of Mills and other witnesses in this case establishes the following factual background, which is undisputed unless otherwise noted throughout this opinion. Mills was a practical nurse in Great Falls, Montana, until 1980 when she retired and sold her home on a contract for deed. An escrow account with Guaranty Escrow was established and the purchaser began making payments of $305.90 per month to Guaranty Escrow. Mills planned to live on these payments and her Social Security income.

Mills purchased a home in Sheridan, Montana. Her testimony indicates that her former husband, with whom she had reconciled, cashed in his retirement benefits to make a down payment of $20,000 on the Sheridan home. Mills arranged for Guaranty Escrow to make payments directly to the Bank of Sheridan to cover the monthly mortgage payments of $304.17 on the Sheridan property.

2

E. Robert **Brown** (Brown) **owned** Guaranty Escrow. Mills testified that she contacted him as early as 1984 when payments she depended on to cover mortgage payments on the Sheridan home were late and she was forced to use her limited Social Security income to cover the mortgage payments. Mills testified that she tried to get information from Brown on more than one occasion and Brown either refused to talk with Mills or he "stonewalled" her. Although Mills did not keep records, she claimed that she was shorted two payments in 1984 and as many as four payments per year after 1984. This information in unverifiable because most of Brown's records were shredded or otherwise destroyed.

Mills also contacted the purchasers and determined that they had been making monthly payments to Guaranty Escrow. Mills testified that she became convinced that Brown was a "crook." However, she did not seek legal assistance to recover the payments she had not received; she testified that she could not afford an attorney. Instead, Mills turned the Sheridan property back to the bank, thinking that she had no other recourse because the house payments, if not paid from escrow, took nearly all of her monthly Social Security check. Mills testified that she checked herself in at Warm Springs State Hospital and spent five weeks in treatment there after losing the house in Sheridan.

Attorney Tierney practiced law in Butte and also two days each week in Whitehall. In 1986, Mills was living in Whitehall and contacted Tierney about her problems with the late and missing payments from Guaranty Escrow which were now to be sent to Mills'

3

account at a Whitehall credit union. Mills testified that she had tried again unsuccessfully to get the problem straightened out with Brown at Guaranty Escrow.

Mills testified that she fell and injured herself outside her apartment on the day she was to meet with Tierney, and postponed her appointment until she was out of the hospital. Tierney represented her in a personal injury claim for that fall as well as the matter of the late payments from Guaranty Escrow.

Mills told Tierney about her problem with the late and missing payments. She testified that she told Tierney that she did not trust Brown and that she thought he was the root of the problem. She also told Tierney that she did not understand why Donald Ayers was now living in the house and making the payments and she asked Tierney to check this for her also. Tierney accepted a retainer of $100 and agreed to investigate the problems Mills was having with the escrow payments.

Tierney wrote to Guaranty Escrow, asking for a copy of escrow documents to explain transfers of the property to subsequent owners. He also asked for copies of the current insurance policy on the home, copies of receipts for tax statements for 1985 and ledger copies of payments made by Donald Ayers. He did not specifically ask for--nor did he receive in response to the letter--copies of records to indicate whether Guaranty Escrow was making monthly payments to Mills. When he received a copy of Guaranty Escrow's records showing all payments had been made by Donald Ayers and Dianne Ayers Mielke (Mielke) to Guaranty Escrow, Tierney

4

explained to Mills that she must be wrong about missing payments. Although he did not further investigate the matter of the late and/or missing payments, he did handle a transfer of the contract from Jack May to Ayers and Mielke.

Still concerned about the late and missing payments, Mills testified that she went to Great Falls in 1987 and met with Donald Ayers. Ayers showed her his records indicating that he was making the monthly payments to Guaranty Escrow. Mills testified that she then contacted Brown in person and Brown again stonewalled her. Even more convinced that Brown was crooked, she testified that she told Tierney again of her fear that Brown was dishonest and that he would steal her money unless something was done to prevent it. Mills testified that she was not pursuing a claim for previously missed payments and, at that point, wanted only to prevent Brown from taking any more of her money.

Tierney testified that he arranged for the transfer of the property from Jack May to Ayers and Mielke and collected a fee from Donald Ayers to complete the transfer. He testified that he then suggested to Mills that she try to get the contract paid off early. Tierney talked to Mielke concerning an early payoff of the contract and learned that she was trying to sell the house; Tierney and Mielke discussed the possibility of Mills' accepting a discounted principal payment in return for early payoff of the contract. Mielke asked Tierney to see whether Mills would accept a $5,000 reduction of principal, which at that time was approximately $36,000.

Mills agreed to the discount. Mielke testified that she asked for written confirmation of the discount at the direction of her realtor. In response to this request, Tierney wrote a letter dated October 23, 1987 verifying that Mills had agreed to discount the principal by $5,000 in exchange for an early payoff. Tierney's letter also indicated that he would prepare the necessary release for Mills' signature at the time of a sale to authorize the escrow agent to release instruments of title to Mielke upon payment of the discounted principal amount. The deposition testimony of numerous witnesses provides that, over the next two months, Tierney was in contact numerous times with Mielke, with the realtor representing Mielke and with an agent of the title company handling the closing of the sale. Mills testified that she instructed Tierney to make sure that she got her money from the payoff of the contract for deed and to make sure that Brown did not get her money. Tierney did not inform any of the parties he had dealt with who were involved in the sale--Mielke, the realtor, or the title company-- that Mills was concerned about Brown taking her money.

Prior to closing the sale, Mielke assigned her interest in the discount by typing the following on the bottom of Tierney's letter and having her signature notarized:

> With regards to the above payoff authorization made by Ida Mills, I, the undersigned, hereby transfer said discount to George Krauss, purchaser of property at 1300 5th Avenue N.W.

Closing was completed on January 19, 1988, with First Montana Title Company handling the disbursements; upon payment of the principal amount of $35,091.96, Guaranty Escrow gave the title instruments to

the title company.  No mention of the discount was made on any of the closing instruments.  According to the testimony of the realtor, the title company representative and Mielke, this was done at the instruction of the mortgage company providing an FHA guaranteed loan to the purchaser for the full selling price.

On the day following closing, the purchaser, George Krauss, took the copy of Tierney's letter authorizing the discount to Guaranty Escrow.  Without contacting Tierney or Mills, Brown paid $5,000 to Krauss.  The closing was completed without Mills' knowledge and no payment was made to Mills for any of the remaining proceeds of the payoff.

Mills testified that she contacted Tierney when she did not receive the payoff following the sale.  Tierney testified that he contacted Mielke immediately and Mielke informed him that the closing had been completed on January 19, 1988.  Mielke also told him there were rumors going around in Great Falls about Brown stealing money from escrow accounts.  Tierney testified that he subsequently learned that the FBI had shut down Brown's office and Brown had been arrested and charged with felony theft.

Brown was prosecuted and later imprisoned for crimes arising from his handling of escrow accounts.  Mills' money was never recovered from Brown.  Mills testified that, following the loss of her money, she suffered a "nervous breakdown" and was hospitalized twice for that condition.

<u>Did the District Court err in granting defendant Tierney's motion for summary judsment?</u>

Our standard of review of an order by a district court

granting summary judgment is the same as that used by the district court under Rule 56(c), M.R.Civ.P. Morton v. M-W-M, Inc. (1994), 263 Mont. 245, 249, 868 P.2d 576, 578. Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), M.R.Civ.P. It is never a substitute for a trial on the merits. Morton, 868 P.2d at 578-79.

Ordinarily, issues of negligence are questions of fact not readily susceptible to summary adjudication. Brohman v. State (1988), 230 Mont. 198, 201, 749 P.2d 67, 69. However, questions of fact may be determined as a matter of law in certain cases where reasonable minds could reach but one conclusion as to causation. Brohman, 749 P.2d at 70. It is well established that in an action based in negligence, summary judgment favoring a defendant is proper only if the plaintiff fails to establish an element material to his negligence claim. See, e.g., Bickler v. Racquet Club Heights Assoc. (1993), 258 Mont. 19, 23, 850 P.2d 967, 970; and Dillard v. Doe (1992), 251 Mont. 379, 382, 824 P.2d 1016, 1019.

In order to establish a cause of action for attorney malpractice, a professional negligence action, there must be a showing that the attorney owed his client a duty of care, that there was a breach of this duty by a failure to use reasonable care and skill, and that the breach was the proximate cause of the client's injury resulting in damages. Kane v. Miller (1993), 258 Mont. 182, 187, 852 P.2d 130, 133, citing Merzlak v. Purcell (1992), 252 Mont. 527, 830 P.2d 1278.

The District Court concluded that Tierney had no duty to monitor the activities of the realtor, title company and escrow company and that Tierney did not breach the standard of care required of attorneys handling assignments of contracts for the purchase of property and real estate closings in the state of Montana. The court further determined that the actions of the realtor, title company and escrow company are superseding intervening actions which are the sole proximate cause of Mills' damages. This is not a typical case of an attorney handling an assignment of a contract and a closing of the sale of real estate, however. In this case, Tierney's client was not a party to the closing and she had expressed her concerns that the escrow agent be left out of the transaction.

From our review of the affidavits, depositions and pleadings composing the record in this case, we conclude there is a key question of fact regarding the extent of Tierney's representation of Mills in this matter and whether Tierney breached the requisite standard of care. Further, there are questions of fact concerning proximate causation.

Mills testified that she repeatedly advised Tierney of her concerns that Brown was a "crook" who had stolen her money in the past and that she was concerned that he might steal money from the early payoff of the contract in the event of a sale by Mielke. She testified that he told her that could not happen. Tierney testified that he regarded Mills as "paranoid." He conceded that he had no medical basis for that conclusion and did not tell Mills

9

about his assessment of her mental state.

Tierney testified that he merely agreed to contact Guaranty Escrow to determine if payments were being made to it by the purchaser and that Guaranty Escrow provided him with ledger documentation indicating that the payments had been made to Guaranty Escrow. The documentation provided by Guaranty Escrow in response to Tierney's request did not contain actual proof that the payments had in fact been made to Mills or that Brown had not stolen any of her money as Mills claimed. Tierney apparently assumed that she had no basis for her concerns and failed to act as if they were legitimate.

In a summary judgment action, plaintiffs are entitled to all reasonable inferences which may be drawn from the offered proof and which indicate any issue of fact which would defeat the summary judgment motion. Lorash v. Epstein (1989), 236 Mont. 21, 24, 767 P.2d 1335, 1337. Inferences can be made in favor of Mills from the record indicating that Tierney did not take Mills' suspicions about Brown seriously and, further, that he did nothing to assuage Mills' concerns.

Moreover, there are numerous indications in the record to support the inference that Tierney's representation of Mills in the matter of the contract for deed extended further than Tierney would have the Court believe. Mills testified that she hired him to investigate why her escrow payments were missing and late, that she specifically told him about her concerns about Brown's dishonesty and that she specifically instructed him to make sure that Brown

10

did not get her money when the sale from Mielke to Krauss took place. In addition to negotiating the discount with Mills, Tierney talked to Mielke and her realtor numerous times prior to the sale and also talked to Jo Roberts, a closing agent for First Montana Title Company, prior to the sale. Tierney's letter to Mielke confirming the discount states that he would prepare the necessary releases and obtain Mills' signature to forward to the escrow company. These facts raise an inference that Tierney undertook representation of Mills' interest up to and including the closing and, therefore, had a duty to make sure Mills received her money. There was no written retainer agreement on this matter, but Tierney accepted a $100 retainer and a subsequent payment of $150 from Mills. Tierney further testified in his deposition that he was doing much of his representation in the real estate matter as a favor to Mills after representing her in the personal injury action.

Although Tierney's expert testified that Tierney had no duty to monitor the transaction to ensure Mills received her money from the early payoff of the contract for deed, Mills' expert testified that the attorney-client relationship existing between Tierney and Mills involved overseeing the resale of Mills' former residence and collection of proceeds on the contract for deed under which Mills originally sold her residence. He also stated in his affidavit that from his review of all the pertinent documents in the record, Mills had instructed Tierney to make certain that payment was not received by Guaranty Escrow Services, but he failed to carry out

those instructions.

Mills' expert further stated his assessment from reviewing the record that it was apparent that Mills relied entirely upon Tierney to handle the transaction. He opined that the standard of care applicable to transactions of this type required Tierney to make inquiry on behalf of Mills as to the record of payments received by and made by Guaranty Escrow, to clearly instruct the realtor and title company not to make payment directly to Guaranty Escrow, to undertake action in accord with the instructions and wishes of the client, to obtain full and complete information about the reasons for the discount, and to at least require that any checks be made payable jointly. Tierney's expert stated that there was no duty; however, his opinion was based on an incomplete knowledge of the facts. He did not review the depositions of Mills, Tierney or Mielke. We conclude there is no basis for summary judgment on the elements of duty and breach in this case.

Tierney's brief on appeal concentrates argument on the issue of proximate causation. Proximate cause is analyzed in terms of foreseeability. United States Fidelity & Guar. Co. v. Camp (1992), 253 Mont. 64, 69, 831 P.2d 586, 589. Although normally a question for the jury to decide, in certain cases foreseeability may be determined as a matter of law for purposes of summary judgment. Such cases involve factual circumstances where it is clear that the plaintiff cannot prove by a preponderance of the evidence that the defendant proximately caused the injury in question. Camp, 831 P.2d at 590, citing Kiger v. State Dept. of Institutions (1990),

12

245 Mont. 457, 462, 802 P.2d 1248, 1251.

Tierney contends that if the Great Falls realtors, bankers and title companies could not foresee that Brown might embezzle fiduciary funds, he should not be required to foresee that Brown would steal Mills' money because he practices law so far from Great Falls. He contends that the District Court correctly determined that the acts of the Great Falls realtors, escrow company and title company were superseding and intervening actions which were the sole proximate cause of Mills' damages.

Mills contends that Tierney failed to adequately investigate her concerns about Brown initially and then compounded this error by ignoring her instruction to keep Brown from getting her money at the time of closing the sale between Mielke and Krauss. She further contends that he did not tell her he was not going to follow her instructions or that he considered she was mixed up or "paranoid." She states that he left her with the belief that he would take care of her interests and would follow her instructions and then "dropped the ball." Thus, according to Mills, she did not see the need to obtain another attorney or to try to handle the transaction herself.

On the question of proximate causation, Mills contends that Tierney could foresee, if Mills' concerns about Brown were in fact correct, that Brown might steal her money if steps were not taken to prevent that. She contends there is an issue of material fact as to whether Tierney did an adequate job of monitoring the progress of the sale and protecting her interests because it was

13

foreseeable to Tierney that Mills would be injured if he ignored her instructions. She contends that Brown would not have been able to get her money if Tierney had made the other defendants in this action aware of her concerns and had instructed them to act differently to safeguard her interests.

Most negligence actions contemplate some action on the part of a defendant which is the actual and proximate cause of the plaintiff's damages. However, failure to act can form the basis for a claim of negligence as well. Comment e to § 302B of the Restatement (Second) of Torts (1965) is applicable to the circumstances present in this case and states the following:

> There are . . situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others. In general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him against such intentional misconduct . . . The following are examples of such situations. . .
>
> A. Where, by contract or otherwise, the actor has undertaken a duty to protect the other against such misconduct. Normally such a duty arises out of a contract between the parties, in which such protection is an express or an implied term of the agreement.

Mills' assertions that her injury was foreseeable by Tierney and that "but for" his inaction, she would not have lost her money are material fact issues.

We conclude that the issues raised by Mills are not the sort which may be determined as a matter of law for purposes of summary judgment. She has raised genuine issues of material fact which are not speculative and conclusory and Tierney has not demonstrated that the acts of the other defendants are superseding intervening

14

acts which relieve him of liability as a matter of law.

We hold the District Court erred in granting Tierney's motion for summary judgment.

Reversed and remanded.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Justices