No. 98-344

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 199

CARLOS LOPEZ,

Plaintiff and Appellant,

v.

GREAT FALLS PRE-RELEASE SERVICES, INC.,

Defendant and Respondent.

APPEAL FROM: District Court of the Eighth Judicial District,

In and for the County of Cascade,

The Honorable Marc G. Buyske, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

William D. Jacobsen; Thompson, Jacobsen & Potts,

Great Falls, Montana

For Respondent:

Ward E. Taleff; Alexander, Baucus, Taleff & Paul,

Great Falls, Montana

Submitted on Briefs: March 25, 1999

Decided: August 26, 1999

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1. Carlos Lopez (Lopez) brought suit against the Great Falls Pre-Release Center (the Center) in the Eighth Judicial District Court, Cascade County, claiming that the Center had been negligent in allowing a potentially dangerous felon to escape and inflict serious bodily injury on Lopez. Lopez appeals from the District Court's order granting summary judgment to the Center on Lopez's negligence complaint, in which the court found that there were no genuine issues of material fact and that no reasonable person could have foreseen that the actions of the Center would cause harm to Lopez. We reverse.

¶2. The sole issue on appeal is whether the District Court erred in awarding summary judgment to the Center on the ground that the attack on Lopez by the escaped felon was unforeseeable as a matter of law.

Factual and Procedural Background

¶3. The facts, viewed in the light most favorable to Lopez, are as follows:

¶4. On the evening of September 28, 1994, Lopez was home alone in Great Falls when he heard a knock at his front door. Upon answering the door, Lopez confronted Merle Gardipee (Gardipee), a resident of the Center who had left the Center on a community pass on September 24, 1994, and failed to return. Gardipee suddenly attacked without provocation and inflicted serious bodily injuries on Lopez, the most serious of which involved Gardipee viciously biting off approximately half of Lopez's right ear.

¶5. Gardipee came to the Center from the Montana State Prison on September 9, 1994, where he had been incarcerated on burglary and theft convictions. Gardipee had a long criminal record, as well as a history of daily alcohol and drug abuse. He also had a history of psychological problems, including multiple suicide attempts. In part because of these

problems, Gardipee had been denied admission to virtually every other pre-release center in Montana. For example, in rejecting Gardipee's application, the Missoula pre-release facility had labeled Gardipee a "high risk" and noted that he had a "troublesome" psychological profile.

¶6. These facts were known to the Center prior to accepting Gardipee as a resident, as they were contained in the Center's file on Gardipee. Also contained in the Center's file was a response by Gardipee, when asked whether he "would risk his freedom for alcohol," to the effect that " 'I always have.' " Furthermore, Gardipee was a native of Great Falls, and it was a matter of concern to both Gardipee and the Center that there was a higher probability that Gardipee might get into trouble in his home town. Despite these concerns, Gardipee was accepted at the Center. However, two of the five members of the screening board voiced vigorous dissents to Gardipee's acceptance at the Center. Gardipee's acceptance was conditioned on his obtaining mental health counseling and chemical dependency treatment.

¶7. On the evening of September 17, 1994, a mere eight days after Gardipee's arrival at the Center, he was issued his first community pass.[1]

> At that time, Gardipee had not yet received any of his required counseling. Gardipee's pass authorized him to visit his girlfriend at her residence in Great Falls from 7:00 p.m. until 9:00 p.m. During Gardipee's visit, the Center took precautions to confirm Gardipee's presence at his girlfriend's house, including visually confirming that Gardipee was at the agreed upon location shortly after 7:00 p.m., as well as requiring Gardipee to call the Center at 8:00 p.m., with which Gardipee complied. However, when the Center attempted to call Gardipee back at the phone number he had provided for his girlfriend's house, there was no answer despite repeated attempts. Although Gardipee did return to the Center before his September 17 pass expired, the Center was never able to verify whether Gardipee had been at the required location throughout the duration of his community pass.

¶8. Because Gardipee's presence could not be verified during his first outing, he was written-up by the Center for a violation of the conditions of his September 17 pass. Although Gardipee claimed that his girlfriend's phone had simply malfunctioned, he pled guilty to the infractions. In fact, Gardipee had left the pass location after making the 8:00 p.m. call-in, and had told his girlfriend, before leaving, to let the phone ring if anyone tried to call. While Gardipee had been informed at his initial orientation at the Center that any

violations of pass conditions could result in a loss of pass privileges, Gardipee's pass privileges were not restricted in any manner for the admitted infraction. In fact, Gardipee was merely given a verbal warning by the Center.

¶9. On September 24, 1994, one week after violating his first pass, Gardipee was issued another community pass. This pass again permitted Gardipee to visit his girlfriend at her house from 7:00 p.m. to 9:00 p.m. At the time of issuance of the second community pass, Gardipee still had not received any of his required drug or alcohol counseling. During the outing, Gardipee called in to the Center at the halfway point as required by his pass. Thereafter, notwithstanding Gardipee's violation of his pass the previous week, the Center did not perform a callback to verify that Gardipee was in fact at his girlfriend's house as agreed upon. Moreover, unlike the preceding week, the Center did not attempt to visually confirm Gardipee's presence at his girlfriend's house.

¶10. Gardipee failed to return to the Center upon the expiration of his community pass at 9:00 p.m. on September 24. Pursuant to the contract between the Center and the State Department of Corrections (DOC), the Center was required to take specific actions in response to Gardipee's "walkaway." Primarily, the Center was required to call local law enforcement authorities to notify them of Gardipee's absence and to ask that they attempt to locate and apprehend him. Under the contract, the Center was supposed to take such action "immediately" upon confirming a resident's unauthorized absence. However, the Center did not place an "attempt to locate" call to the Great Falls Police Department until 12:25 a.m. on September 25, 1994, at which point Gardipee was almost three and one-half hours overdue on his pass. Additionally, the Center had another resident fail to return on a community pass that very same evening, and the Center's information suggested that Gardipee and this other escapee were probably together. Nonetheless, the Center did not place an attempt to locate call with local authorities, with respect to either escapee, until 12:25 a.m. the next day.

¶11. The Center issued a press release concerning Gardipee's escape on September 25, 1994, which included the information that Gardipee was "not considered dangerous." However, prior to issuance of the press release, the Center had received information that Gardipee had stolen a car and some gasoline following his escape. The press release failed to mention these facts in describing Gardipee as not dangerous.

¶12. At the time of Gardipee's escape, the Center also had reason to know that there was animosity between Gardipee and Lopez. Gardipee had been having an affair with Lopez's

wife. Although there is no evidence that anyone at the Center was specifically aware of this hostility between Gardipee and Lopez, Gardipee testified that he had received a threat from Lopez while at the Center and had reported the incident to Center personnel. Apparently, the Center did not follow up on this report, either before or after Gardipee's escape.

¶13. Gardipee remained at large for four days prior to attacking Lopez. He spent the first few days following his escape at his brother's home and his mother's home, both of which are in Great Falls. While at large, he spent most of the nights at his brother's home. The Center's files contained the name of Gardipee's mother and the address of Gardipee's mother's home, which was only a few blocks from the Center. Under the terms of the Center's walkaway policy, Center personnel were required to attempt to contact relevant visitors of the escapee and to "exhaust all possible alternatives in the attempt to locate the resident." However, no one at the Center made any attempt to contact Gardipee's mother or check on her residence following Gardipee's escape; nor were the local law enforcement authorities asked to do so.

¶14. The District Court rejected Lopez's position that Gardipee posed a reasonably foreseeable threat to commit violence on third parties in the Great Falls area. The court's principal rationale in granting summary judgment to the Center was "that it is not reasonable to assume that a person convicted of non-violent property crimes is a foreseeable danger to take part in violence." Thus, the District Court ordered Lopez's complaint against the Center dismissed with prejudice, and vacated the jury trial which had been previously set.

## Discussion

¶15. Did the District Court err in awarding summary judgment to the Center on the ground that Gardipee's attack on Lopez was unforeseeable as a matter of law?

¶16. Summary judgment is proper only where the record reveals a complete absence of genuine issues of material fact and the moving party is entitled to judgement as a matter of law. Rule 56(c), M.R.Civ.P. In a summary judgment proceeding, the evidence must be viewed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn therefrom in favor of the party opposing summary judgment. Bowen v. McDonald (1996), 276 Mont. 193, 199, 915 P.2d 201, 205; Porter v. Galarneau (1996), 275 Mont. 174, 179, 911 P.2d 1143, 1146. We review a district court's grant of summary

judgment *de novo*, applying the same evaluation as the district court based on Rule 56, M. R.Civ.P. *See* Bruner v. Yellowstone County (1995), 272 Mont. 261, 264, 900 P.2d 901, 903.

¶17.The District Court reasoned that Gardipee's criminal act against Lopez was not reasonably foreseeable because Gardipee had a nonviolent criminal history which "gave no indication of a disposition to commit violence." Lopez asserts that there are numerous disputed factual issues in this case that preclude the granting of judgement as a matter of law. In addition, Lopez challenges the District Court's legal conclusion that Gardipee's attack was not foreseeable by the Center because Gardipee did not have a documented history of violent crime.

¶18.It is necessary, in order to sustain a negligence action, that the plaintiff establish a legal duty on the part of the defendant, a breach of that duty, causation, and damages. United States Fidelity and Guar. Co. v. Camp (1992), 253 Mont. 64, 68, 831 P.2d 586, 588-89. Thus, we must first address the question of whether the Center owed a legal duty to Lopez. The District Court concluded that, since it was not foreseeable that Gardipee would commit violence, the Center owed Lopez no such duty. For the reasons that follow, we determine that the contract between the Center and the DOC imposes a legal duty of care on the Center to those members of the general public, including Lopez, who would be placed within the foreseeable zone of risk created by a breach of the Center's custodial duty to supervise and control pre-release residents.

¶19.The Center contends that it owed Lopez no duty because the DOC did not "delegate jurisdictional supervision" to the Center under statutes governing the State's supervised release program which were in effect at the time of the alleged negligence. *See* §§ 46-23-401 and -421, MCA (1995).[(2)] Since the DOC allegedly retains legal custody over inmates participating in the pre-release program, the Center claims that any duty to third parties was owed by the State of Montana, not the Center. We disagree with this argument for a number of reasons.

¶20.First, we concur with Lopez that these statutes show no unequivocal intent by the Montana Legislature to eliminate common law liability for the negligence of a residential pre-release center approved under the State's pre-release program. *See* Webb v. Montana Masonry Const. Co. (1988), 233 Mont. 198, 210, 761 P.2d 343, 350 ("Common law rights are extinguished only upon strict construction."); *see also* Kelleher v. State (1972), 160 Mont. 365, 370-71, 503 P.2d 29, 32.

¶21.Second, under the pre-release statutes in effect at the time of the alleged negligence, the Center, as a "Sponsor," was an entity "approved by the [DOC] to undertake the supervision of prisoners participating in the supervised release program." Section 46-23-401(5), MCA (1995) (emphasis added). Contrary to the Center's claim, since a pre-release participant is still technically serving a criminal sentence with the DOC and has not been otherwise released into the community subject only to the limited supervision of a parolee, a residential pre-release center necessarily assumes the custody of an inmate from the DOC, thereby assuming an obligation to supervise that inmate. This observation is borne out by the contract itself, which suggests that the Center, indeed, assumed "custody" of a pre-release participant. For example, the contract provides that the DOC "agrees to assume custody" of a pre-release participant if the Center believes that participant "to be unsuitable for treatment in its facility." The contract also mandates that the Center "will surrender custody" of any pre-release participant who "violates . . . his [or her] residency agreement."

¶22.Lastly, pursuant to the specific terms of the contract, it is clear that the Center assumed the custodial responsibility to monitor and control Gardipee's actions, and that the Center further assumed liability for any negligent failure to comply with the agreement. Under the contract, the Center agreed to "immediately commence an individualized program for each new [inmate] designed to set the limits of the [inmate's] behavior, responsibilities, rights and privileges." Other provisions more fully detail the supervisory duties assumed by the Center, including: to maintain "daily monitoring of the [inmate's] whereabouts and activities"; to keep written files on each pre-release participant; to promptly report any pre-release violations to the DOC; to maintain security measures such as "sign out and sign in procedures"; to closely monitor any "travel" by pre-release participants; and to take "every attempt to locate" any resident who was "unaccounted for." These provisions demonstrate that the Center assumed a duty to monitor and control an inmate's "behavior" while residing at the Center.

¶23.Additionally, the Center contractually agreed to assume responsibility for any "financial loss . . . due to the negligence . . . or failure for any reason, to comply with the terms of [the] contract." The Center also agreed to "indemnify" the DOC for any negligent acts. Accordingly, the contract required the Center to maintain substantial commercial general liability insurance to cover such scenarios. Nor could the Center assign, sell, transfer, subcontract, sublet, or delegate its duties under the contract to avoid liability: "The [Center] shall remain liable as between the original parties to the contract as if no such assignment had occurred."

¶24.As a general rule, there is no duty to protect others against harm from third persons.

W. Page Keeton & William Prosser, Prosser and Keeton on the Law of Torts § 56, at 385 (5th ed. 1984). "Traditionally," as we have recognized, "a person is not liable for the actions of another and is under no duty to protect another from harm in the absence of a special relationship of custody or control." Krieg v. Massey (1989), 239 Mont. 469, 472, 781 P.2d 277, 279 (citing Prosser and Keeton on the Law of Torts § 56 (5th ed. 1984)) (emphasis added). Such a duty may arise where, as here, the special relationship is "custodial by nature," thus requiring the defendant to exercise reasonable control over his or her charge so as to prevent foreseeable harm to others. *See* Prosser and Keeton on the Law of Torts § 56, at 383-84 (5th ed. 1984).

¶25.As this Court has recognized:

"There are . . . situations in which the actor, as a reasonable [person], is required to anticipate and guard against the intentional, or even criminal, misconduct of others. In general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him [or her] against such intentional misconduct . . . . The following are examples of such situations . . . .

A. Where, by contract or otherwise, the actor has undertaken a duty to protect the other against such misconduct. Normally such a duty arises out of a contract . . . in which such protection is an express or implied term of the agreement."

Mills v. Mather (1995), 270 Mont. 188, 198, 890 P.2d 1277, 1283-84, *quoting* Restatement (Second) of Torts § 302B, cmt. e (emphasis added).

¶26.We conclude that the Center entered into a "special relationship of custody or control" over Gardipee via the contract with the DOC. *See Krieg*, 239 Mont. at 472, 781 P.2d at 279. However, that does not end our inquiry. It is axiomatic that in the absence of foreseeability, there is no duty; in the absence of duty, there is no negligence. Graham v. Montana State University (1988), 235 Mont. 284, 287, 767 P.2d 301, 303, *quoting* Schafer v. State, Dept. of Institutions (1979), 181 Mont. 102, 105, 592 P.2d 493, 495. As discussed below, we further conclude that it is implicit in the contract with the DOC outlining the Center's specific supervisory duties over pre-release residents that the Center undertook a "special responsibility" to protect those members of the general public who would be placed within the foreseeable zone of risk created by the negligent supervision of a pre-

release resident. *See Mills*, 270 Mont. at 198, 890 P.2d at 1283-84.

¶27.Under Montana law, the duty element of negligence turns primarily on foreseeability.

Foreseeability as it relates to the duty element of negligence is measured on a scale of reasonableness dependent upon the foreseeability of the risk involved with the conduct alleged to be negligent:

"Foreseeability is of prime importance in establishing the element of duty . . . . If a reasonably prudent defendant can foresee neither any danger of direct injury nor any risk from an intervening cause he [or she] is simply not negligent.

. . . .

. . . The obligation of defendants turns on whether:

' . . . the offending conduct foreseeably involved unreasonably great risk of harm to the interests of someone other than the actor. . . . Duty, in other words, is measured by the scope of the risk which negligent conduct foreseeably entails.' "

Busta v. Columbus Hosp. Corp. (1996), 276 Mont. 342, 362-63, 916 P.2d 122, 134, *quoting* Mang v. Eliasson (1969), 153 Mont. 431, 437-38, 458 P.2d 777, 781.

¶28.Put simply, in analyzing foreseeability in the duty context, we look to whether or not the injured party was within the scope of risk created by the alleged negligence of the tortfeasor--that is, was the injured party a foreseeable plaintiff? *See Busta*, 276 Mont. at 360-61, 916 P.2d at 133, *quoting* Palsgraff v. Long Island Railroad Co. (N.Y. 1928), 162 N.E. 99, 100 (" 'The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or others within the range of apprehension.' . . . [D]uty requires a foreseeable plaintiff . . . .").

¶29.Most pre-release facilities, like the Center, are located in a residential setting. Such

a setting is critical to a pre-release center's institutional function to gradually acclimate an inmate for the transition from incarceration to free society. At the same time, the Center is undeniably a custodial institution with specific legal responsibilities, pursuant to its contract with the DOC, to monitor and supervise pre-release residents. *See Schafer*, 181

Mont. at 107, 592 P.2d at 496 (suggesting that a custodial institution may be held liable for negligence where, due to negligent supervision and a "lack of restraint," one of its wards injures a third party), *overruled on other grounds by* Estate of Strever v. Cline (1996), 278 Mont. 165, 178, 924 P.2d 666, 674; *cf. Graham*, 235 Mont. at 289, 767 P.2d at 304 (holding that the university assumed a special, custodial relationship over a high school student participating in a summer residential apprenticeship program, which imposed a duty on the university to exercise reasonable care in supervising program participants).

¶30. While there is certainly some social utility to the institutional function of a pre-release center, such social utility does not militate against the imposition of a legal duty of care. The primary responsibility of a pre-release center in supervising its residents is, much like that of a parole officer in supervising a parolee, "the protection of society." Starkenburg v. State (1997), 282 Mont. 1, 17, 934 P.2d 1018, 1028. It is for this reason that the contract between the Center and the DOC imposes specific supervisory duties as well as liability for a breach of those duties on the Center. In other words, the Center's contractual duty to control pre-release residents specifically contemplates the foreseeability of risk from an intervening force: that a pre-release resident may, by virtue of his or her status as an inmate, pose a risk of escape and resulting injury to members of the general public who would be placed within the zone of danger created by the pre-release center's failure to exercise reasonable care in supervising that inmate.

¶31. The existence of a legal duty can be determined as a matter of law. *See* Nautilus Ins. Co. v. First Nat'l Ins., Inc. (1992), 254 Mont. 296, 299, 837 P.2d 409, 411. We hold, as a matter of law, that the Center owed a duty of reasonable care to all those persons present within the area to which Gardipee could reasonably and foreseeably have access during his period of freedom. That class of persons clearly encompasses Lopez, who resided relatively near to the Center in Great Falls. In other words, Lopez is a foreseeable plaintiff. Thus, the Center clearly owed nearby residents, like Lopez, a legal duty of care to adequately supervise Gardipee so as to prevent him from escaping and potentially inflicting harm. However, whether the Center breached the legal duty of care it owed Lopez is an issue which we do not reach here. Breach of a legal duty is a question of fact suitable for resolution by the fact finder at trial. Estate of Strever v. Cline (1996), 278 Mont. 165, 175, 924 P.2d 666, 672.

¶32. We now turn to the question of causation in this case. Although foreseeability is generally properly confined to the duty element of negligence under Montana law, where a

dispute presents the issue of an intervening act of a third party, as here, we address foreseeability in the proximate cause context as well. *See generally Busta*, 276 Mont. at 360-73, 916 P.2d at 133-41, *overruling* Kitchen Krafters, Inc. v. Eastside Bank of Montana (1990), 242 Mont. 155, 789 P.2d 567. In analyzing foreseeability in the context of proximate cause, we are concerned with whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury incurred by the plaintiff. *See Busta*, 276 Mont. at 379, 916 P.2d at 144 (Erdmann, J., concurring in part and dissenting in part).

¶33.This case effectively presents a dispute as to whether the intervening criminal attack by Gardipee was a superseding cause of the harm incurred by Lopez which, if not reasonably foreseeable, would break the chain of causation and absolve the Center of liability. There is no question that "but for" Gardipee's escape from the Center while on a community pass Lopez would not have been attacked and injured by Gardipee on the night in question. However, there is a good question whether Gardipee's attack on Lopez was reasonably foreseeable by the Center and, thus, the cause of the injuries suffered by Lopez.

¶34.We have recently emphasized that, in cases involving intervening superseding acts of a criminal or noncriminal nature, "trial courts must continue to carefully review each fact situation . . . on a case-by-case basis . . . ." *Estate of Strever*, 278 Mont. at 179, 924 P.2d at 674. The causal issue of intervening criminal or noncriminal acts "normally involves questions of fact which are more properly left to the finder of fact for resolution." *Estate of Strever*, 278 Mont. at 178, 924 P.2d at 674.

¶35.Thus, it is only "<u>when reasonable minds could reach but one conclusion</u>" that "the question of foreseeability may be determined as a matter of law for purposes of summary judgment." Kiger v. State (1990), 245 Mont. 457, 462, 802 P.2d 1248, 1251 (emphasis added). We cannot conclude, on the basis of the record before us, that reasonable minds could come to but a sole conclusion--that Gardipee's intervening attack on Lopez was reasonably unforeseeable, thus cutting off the Center's liability for the attack. Rather, reasonable minds could differ as to whether it was reasonably foreseeable by the Center that a failure to adequately supervise Gardipee permitting him to escape could pose an unreasonable risk of harm to Lopez in particular.

¶36.It is true, as the District Court reasoned, that Gardipee's criminal history, though lengthy, primarily consisted of property crimes. We note in passing that Gardipee had also

been convicted of the crime of obstructing a police officer, an offense which suggests a predisposition for conflict and perhaps even violence. Ultimately, however, Gardipee's nonviolent criminal history does not end our inquiry. The Center had other information in its possession suggesting that Gardipee posed a risk of injury to Lopez.

¶37.First, psychological reports in the Center's files indicated that Gardipee suffered from a lengthy history of depression which included the use of anti-depressant drugs. On four different occasions, Gardipee had attempted to commit suicide "by cutting his wrists and putting a gun to his head." The reports indicate that Gardipee was "raised in a very dysfunctional family" and "suffered a great deal of emotional and physical abuse and now struggles with serious alcohol and drug problems" as a result. Perhaps most telling, the reports indicate that Gardipee possesses substantial repressed anger towards his parents, especially his father, who purportedly tried to suffocate Gardipee when he was a child. In this respect, Gardipee had documented "problems dealing with the anger and rage that he feels." Gardipee maintained that he "still wants to hurt his father, saying that he wants to 'beat his ass bad.' " Gardipee's psychological reports portend a sufficient potential for violence towards others, of which the Center knew or should have known.

¶38.Second, the Center's files indicated that other pre-release centers had rejected Gardipee because he was considered a "high risk." Gardipee was considered to be a "serious alcoholic and drug addict." Prior to his admission at the Center, he admitted that he "has no control over his alcohol usage," and that he had "always" risked his freedom for alcohol and would probably continue to do so. Gardipee also readily acknowledged being a "drug addict." For that reason, both the Center and Gardipee were concerned prior to his admission about the higher potential for Gardipee to get into trouble with his old "cronies" in his home town of Great Falls, where Gardipee had a long history of substance abuse and drug dealing. Thus, Gardipee posed a substantial escape risk and the Center knew or should have known of this possibility.[3]

¶39.Finally, in the posture of our summary judgment review, the record supports an inference favorable to Lopez that the Center was aware that there was animosity between Lopez and Gardipee regarding Gardipee's affair with Lopez's wife, and should have therefore known that this adulterous tension might result in a violent outburst between the two men. Although Lopez himself denied having made any threat to Gardipee and there is no evidence in the summary judgment record that any of the Center's personnel were specifically aware of the threat, Gardipee maintained in his deposition that Lopez had threatened him with violence and that Gardipee had filed a grievance with the Center

regarding the threat.

¶40.As noted earlier, all reasonable inferences must be drawn from the record in favor of the party opposing summary judgment. *Porter*, 275 Mont. at 179, 911 P.2d at 1146. In drawing all reasonable inferences in favor of Lopez, we conclude that the summary judgment record raises a genuine issue of material fact as to whether the Center knew or should have known that there was enmity between the two men and, given that Lopez resided in Great Falls, that there was a possibility of violence if Gardipee escaped.

¶41.We hold that the District Court erred in granting summary judgment to the Center. There are genuine issues of material fact precluding the granting of judgment as a matter of law. Thus, whether the Center breached its legal duty to Lopez, as well as whether Gardipee's attack was a superseding cause of the harm to Lopez, are both open questions suitable for resolution by the trier of fact. We remand for a trial on the merits.

¶42.Reversed and remanded.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ KARLA M. GRAY

1. A community pass authorizes a Center resident to be away from the Center, at a particular agreed upon location, for personal reasons. The Center is under no obligation to issue community passes to its residents, and is also free to impose any conditions or restrictions on the issuance of such a pass that it deems appropriate.

2. These statutes were repealed in 1997. *See* Sec. 15, Ch. 322, L. 1997.

3. Lopez does not argue that the Center was negligent in accepting Gardipee, but that the deep dissension on the board in accepting Gardipee as a "high risk" suggests that the Center and its personnel

were put on notice that Gardipee posed a distinct escape risk and would therefore require closer supervision than some of the other residents at the Center.