JUSTICE TRIEWEILER
dissents.
¶37 I dissent from the majority’s conclusions that there was sufficient evidence to submit the issue of independent intervening cause to the jury and that the Plaintiff suffered no harm from those instructions.
¶38 The jury found the State of Montana negligent. The only facts alleged as a basis for the State’s negligence were that it failed to protect the Plaintiff by adequately controlling and supervising Chester Bauer, an inmate for whom the State was responsible. It is not logically possible for the State to have been negligent in the manner alleged and for that negligence not to have been a contributing cause of damage to the young woman that Bauer raped while under the State’s presumed control. The only basis for finding that the State’s omissions were not the cause of Plaintiffs damages was the Court’s instruction that the chain of causation could be severed by the independent, intervening omissions of the county or acts of Chester Bauer. Those instructions should not have been given because the intervening acts and omissions relied on by the State were completely foreseeable. Because they were given, the bizarre and unjust result in this case should be reversed.
FACTUAL BACKGROUND
¶39 Chester Bauer is a sexual predator who was convicted of sexual intercourse without consent in 1983 and sentenced to the Montana State Prison. While at the Montana State Prison, in 1991, he was convicted of intimidation for trying to extort sexual favors from the wife of a prison employee by threatening her and her children. In addition to these two offenses, he was serving a ten-year sentence for aggravated assault and ten years for use of a dangerous weapon when, in 1994, he was transferred by the State of Montana to the Blaine j County jail. Presumably because of the threat that he posed to others, he was denied parole on nine occasions-eight times prior to his transfer to Blaine County. Blaine County prison officials were advised that he had been classified as a minimum security inmate and they] treated him accordingly by making him a trustee.
*133 ¶40 His freedom and mobility while in Blaine County first came to the attention of Montana State Prison officials after he was observed in street clothes, roaming freely about the Blaine County courthouse by Edward Schmidt, a state probation and parole officer. On March 21, 1995, he wrote to Mike Gersack, his supervisor, and sent a copy of his letter to Candyce Neubauer who was in charge of classification of Montana State Prison inmates. In his letter, he advised Gersack and Neubauer that Bauer was being treated as a trustee at the Blaine County jail and in that status, worked at various jobs in the city of Chinook. His work included repairs to private vehicles for which he received payment. He had no particular hours by which he had to return to the prison facility and, in fact, had a private vehicle at his disposal which had been loaned to him by one of the jailers.
¶41 Schmidt pointed out that when he observed Bauer, he was dressed in civilian clothes and that he had been advised by the undersheriff in Blaine County that Bauer had access to go and come as he pleased.
¶42 This information, as well as the fact that Bauer had access to jailhouse keys, was communicated to Mike Mahoney, the warden at the Montana State Prison. Mahoney admitted that he had knowledge of this information prior to Bauer’s attack of Pula and that Bauer in fact was the State’s responsibility. Mahoney gave the following testimony:
Q. This matter regarding Mr. Bauer’s detention up here came to your attention in March of 1995, correct?
A. I believe that’s correct.
Q. And it was brought to your attention because adult probation and parole officer Ed Schmidt expressed concerns about the fact that Mr. Bauer was even up here, didn’t he?
A. My recollection is, Mr. Schmidt had made personal contact with inmate Bauer and was deeply troubled by the issues that he attended to in that conversation and notified the department of his concern.
Q. He saw a Montana State Prison inmate running around like a trustee, didn’t he?
A. I believe that would be a fair observation or assessment, yeah. Q. The prison requested him to look into it further and he reported back to you, did he not?
A. Yes, he did.
Q. And isn’t it true that the information that was provided to you indicated that Mr. Bauer had freedom to come and go as he pleased?
*134 A. In essence, that would probably be fair.
Q. And that he had complete access inside the jail and outside the jail at that point?
A. Again, with the custody level a lot to be desired.
Q. So he was free to roam around inside the jail, wasn’t he?
A. From what I recall, yes, it sounds like he was.
Q. And you were aware of that?
A. At that point in time, yes, I was.
Q. And as well, he could leave the jail and go out into the community, correct?
A. Again, at that point in time, yes.
Q. And you also had concerns because there were problems with his access to keys, correct?
A. That’s correct as well.
Q. And that came to your attention during this period in late March of 1995, correct?
A. All of those issues pretty much stemmed from Officer Schmidt’s contact.
Q. And those concerns prompted a review by you and Candyce Neubauer and William Pohjola at the prison, correct?
A. That’s correct.
Q. That resulted in the classification summary or a reclassification document; is that correct?
A. That’s correct.
Q. Okay. And your recommendation after going through this was what, Mr. Mahoney?
A. If you’re referring to the face sheet?
Q. Yes.
A. I wrote at the bottom that it would appear that the placement does not accurately address public safety and recommend we reevaluate and potentially return to the Montana State Prison.
Q. And that decision never was pursued, was it?
A. No, sir, it was not.
Q. Mr. Bauer was maintained at the Blaine County jail, correct?
A. That’s correct.
Q. And the concerns that you had regarding his freedom inside and outside the jail, they formed the basis for this recommendation of yours, didn’t they?
A. Initially, yes, they did.
Q. And that would include not just the freedom, but his access to *135 keys, correct?
A. Basic security practices.
Q. And the freedom to go inside the jail and outside the jail whenever he wanted, that’s a fundamental breakdown in a detention facility, would you agree?
A. That would probably be a fair assessment, that’s correct.
Q. That inmate is still your responsibility, he’s a Montana State Prison inmate, correct?
A. Still an inmate.
Q. Okay. You can’t change that status, can you, by transferring him to another facility?
A. No, sir, I cannot.
Q. And you can’t also change his court commitment by transferring him to another facility?
A. No, that certainly exceeds the bounds and authority of the warden.
Q. Now, the response that was given to these concerns about access to keys and complete freedom up here in Blaine County, that ended up being Candyce Neubauer’s letter to Sheriff Harrington, correct?
A. I believe that’s correct.
Q. And that letter indicates that the concern of the prison is his ability to access the community, correct?
A. I think the public safety issue was the theme, that would be correct.
Q. There’s nothing in that letter that addressed or dealt with the problems with Mr. Bauer’s access to keys at this facility, is there?
A. No, there’s nothing in here that states specifically keys.
Q. And that’s a concern that as a prison official you would agree that you should specifically address with the detention facility?
A. Most definitely it’s to be addressed. It just wasn’t placed in there.
Q. And, in fact, it wasn’t placed in any written document, was it?
A. To the best of my knowledge, no, it was not.
¶43 In other words, the State of Montana admitted responsibility for the detention and supervision of Chester Bauer. It admitted that those responsible for him knew he was not being detained in a secure fashion and had freedom to not only move about the community but freedom to roam the jail facility and access to keys at the jail. It admitted that *136 these breaches of security were a threat to public safety and it admitted that the only activity it made any effort to curtail was Bauer’s freedom of movement within the community of Chinook.
¶44 This was the situation to which Wendy Pula was exposed when brought by force to be locked in a cell with no freedom of movement on May 25,1995, for failing to appear on a charge of possessing alcohol as a minor, an offense for which we have since held a minor cannot be jailed. State v Bauer, 2001 MT 248, ¶ 33, 307 Mont. 105, ¶ 33, 36 P.3d 892, ¶ 33.
¶45 However, because of Bauer’s freedom of movement, he was able to retrieve jailhouse keys, open the cell door of a minor, take her to his jail cell and force her to have intercourse with him without consent. How, under these circumstances, can it be seriously argued that the acts of this sexual predator were unforeseeable is mystifying.
¶46 The State’s response is that because of Candyee Neubauer’s letter, it had a right to assume that Bauer was under proper supervision and his freedom of movement had been curtailed. However, Neubauer’s letter was written on April 4, 1995, and as acknowledged by Mahoney, was limited in its criticism to Bauer’s unsupervised presence in the community. It made no suggestion that his freedom of movement at the Blaine County jail be restricted or that his access to Blaine County jail keys be denied.
¶47 We have previously held that intervening criminal acts are not always unforeseeable, Estate of Strever v. Cline (1996), 278 Mont. 165, 178-79, 924 P.2d 666, 673-74, and that sometimes intervening acts are foreseeable as a matter of law, Cusenbary v. Mortensen, 1999 MT 221, ¶ 37, 296 Mont. 25, ¶ 37, 987 P.2d 351, ¶ 37.
¶48 In Mills v. Mather (1995), 270 Mont. 188, 198, 890 P.2d 1277, 1283-84, we noted that:
There are ... situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others. In general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him against such intentional misconduct....
(Quoting Restatement (Second) of Torts § 302B cmt. e (1965)).
¶49 The facts in this case present just such a circumstance. The State of Montana had a special responsibility to protect Pula and other potential victims from the harm that Bauer inflicted by his intentional conduct.
¶50 Furthermore, based on the previously mentioned admissions by *137 the State, the threat posed by Bauer was completely foreseeable and the county’s total failure to protect others from him was well known to the State. Therefore, neither Bauer’s conduct nor the county’s conduct could have served as an independent intervening cause protecting the State from liability for its negligence.
¶51 For example, in Cusenbary the plaintiff was injured when an intoxicated patron left the bar, got in his vehicle and drove the vehicle into the bar. The defendant bar owner proposed that the district court instruct the jury that an independent intervening cause severed the chain of causation. The district court declined to do so and the jury returned a verdict for the plaintiff. On appeal, we affirmed the district court and stated that:
[T]his case involves the allegation that the chain of causation was severed by an independent intervening act. However, not all intervening acts are independent. Those that are foreseeable do not break the chain of causation. In other words, if one of the reasons that makes a defendant’s act negligent is a greater risk of a particular harmful result occurring, and that harmful result does occur, the defendant is generally liable. The test is based on foreseeability. [Citation omitted.]
In this case, unlike the act of leaving a vehicle unlocked, the act of Mortensen in serving alcohol to Wells is the very act which caused the conduct that resulted in the injury to Cusenbary. The consequences of serving alcohol to a person who is visibly intoxicated are reasonably foreseeable precisely because of the causal relationship between serving alcohol and drunken conduct. Wells’ drunken conduct was not freakish, bizarre, or unpredictable as Mortensen asserts. Rather, drunken conduct is the expected, predictable, and therefore reasonably foreseeable outcome of serving alcohol to a person who is already intoxicated.
Cusenbary, 296 Mont. at 32-33, 987 P.2d at 355-56.
Accordingly, we conclude that as a matter of law Wells’ conduct of driving a vehicle while intoxicated, through the wall of the Town Tavern, was a foreseeable intervening cause that did not serve to supersede or break the causal chain between Mortensen’s original negligence and the injury to Cusenbary.
Cusenbary, 296 Mont. at 37, 987 P.2d at 358.
¶52 Likewise in this case, the lack of proper supervision of Bauer, a known rapist, who was denied parole on nine occasions because of the known risk that he presented, was the very omission that allowed him *138 to assault the Plaintiff. The consequences of failing to supervise him and of permitting him to freely roam the jailhouse were reasonably foreseeable because they were the exact reason that he had been imprisoned in the first place.
¶53 Finally, it is not correct that the Plaintiff suffered no prejudice from the District Court’s erroneous instructions on intervening cause. The jury was instructed that:
If you find that a negligent act of any other person or entity caused the injury and damage to plaintiff and that this negligent act of other persons or entities occurred after any negligent act of Defendant State of Montana and that this negligent act... could not reasonably be foreseen by Defendant State of Montana to happen in the natural sequence of events, the later negligent conduct of this third person or entity is an independent intervening and superseding cause of the plaintiffs injury and damage.
If you find that the conduct of the third person or entity was the intervening and superseding cause of injury and damage to plaintiff, then you must return your verdict for Defendant State of Montana.
Court’s Instruction No. 18.
¶54 Supersede is defined in Webster’s Ninth New Collegiate Dictionary as “ 2: to take the place, room, or position of; 3: to displace in favor of another.” We have in fact stated in our opinions that an independent intervening cause cuts off the chain of causation. Based on either the standard definition of “supersede” or our own case law, it was perfectly consistent for the jury to conclude that if the county’s or Bauer’s conduct was an independent intervening cause, then the State’s negligence was not the cause of Pula’s damages. It does not matter that the jury did not get to the final question about independent intervening causes. The Court’s instruction was prejudicial and was the only possible explanation for the jury’s finding that the State negligently failed to supervise Bauer but that while he was roaming freely about the jail with access to keys, that failure to supervise did not cause his assault on Wendy Pula.
¶55 The facts of this case shockingly demonstrate an avoidable tragedy caused by the failure of state and local prison officials to protect a young woman from a known sexual predator who had been placed in the State’s custody because of a series of violent criminal offenses. Wendy Pula was an underage girl imprisoned because she was unable to post bond to secure her appearance on a charge of being *139 a minor in possession of alcohol. Had she been convicted of being a minor in possession of alcohol, she could not have been imprisoned for that offense. See Bauer, ¶ 33. Yet while she was in prison for her inability to post bond, she was raped and assaulted by a dangerous predator for whom the State was responsible only to be told that in spite of the State’s negligence, she is entitled to no damages. This result cannot be explained on any evidentiary or logical basis. I conclude that it can only be attributable to the District Court’s erroneous instruction to the jury that the State could be relieved of liability by an intervening independent act. Since there was no intervening act which was “unforeseeable,” the defense was inapplicable and the District Court erred by submitting those instructions to the jury. For these reasons, I would reverse the judgment of the District Court and I dissent from the majority’s decision to do otherwise.
JUSTICE NELSON joins in the foregoing dissent.